United States Court of Appeals

Fifth Circuit

**F I L E D**

September 19, 2003

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

———————————

No. 02-30250

———————————

EFFJOHN INTERNATIONAL CRUISE HOLDINGS, INC.; EFF-SHIPPING LTD.,

Plaintiffs-Appellants,

versus

A&L SALES, INC.; RELIABLE DISPOSAL CO., INC.; FRERET MARINE
SUPPLY; AMWEST SURETY INSURANCE CO.; SWISS REINSURANCE AMERICA
CORP.; COOPER/T SMITH STEVEDORING, INC.; CRESCENT TOWING, INC.;
MARINE MEDICAL UNIT, INC.; GEORGE OTT TRANSPORTATION, INC.;
CASTROL NORTH AMERICA, INC.; ADVANCE MARINE, INC.;
SCHEURING SECURITY, INC.,

Intervenor Plaintiffs-Appellees,

versus

ENCHANTED ISLE MV, ETC.; ET AL.,

Defendants.

———————————

No. 02-30335

———————————

EFFJOHN INTERNATIONAL CRUISE HOLDINGS, INC.; ET AL.,

Plaintiffs,

A&L SALES, INC.; RELIABLE DISPOSAL CO., INC.; FRERET MARINE
SUPPLY; AMWEST SURETY INSURANCE CO.; SWISS REINSURANCE AMERICA
CORP.; COOPER/T SMITH STEVEDORING, INC.; CRESCENT TOWING, INC.;
MARINE MEDICAL UNIT, INC.; GEORGE OTT TRANSPORTATION, INC.;
CASTROL NORTH AMERICA, INC.; ADVANCE MARINE, INC.;
SCHEURING SECURITY, INC.,

Intervenor Plaintiffs-Appellees,

versus

ENCHANTED ISLE MV, ETC.; ET AL.,

                                                    Defendants,

                    CUSIMANO PRODUCE CO.,

                                                    Movant-Appellant.

                            _____

                            No. 02-30360
                            _____

FRERET MARINE SUPPLY, a division of FRERET HARDWARE, INC.,

                                              Plaintiff-Appellee,

        NOEL NOLASCO; EDUARDO SEDO; SERGIY BILOGOLOVY;
         OLEKSANDR ZHUKOV; YURIY PALAMARCHUK; ET AL.,

                              Intervenor Plaintiffs-Appellees,

                            versus

              ENCHANTED CAPRI MV, Etc.

                                                    Defendant,

    AMWEST SURETY INSURANCE CO.; SWISS REINSURANCE AMERICA CORP.,

                          Intervenor Plaintiffs-Appellants.

                            _____

                            No. 02-30414
                            _____

        EFFJOHN INTERNATIONAL CRUISE HOLDINGS, INC.; ET AL.,

                                                    Plaintiffs,

          EFFJOHN INTERNATIONAL CRUISE HOLDINGS, INC.,

                                              Plaintiff-Appellee,

**A&L SALES, INC.; RELIABLE DISPOSAL CO., INC.;**
**FRERET MARINE SUPPLY,**

**Intervenor Plaintiffs-Appellees,**

**versus**

**AMWEST SURETY INSURANCE CO.; SWISS REINSURANCE AMERICA CORP.;**

**Intervenor Plaintiffs-Appellants,**

**versus**

**ENCHANTED ISLE MV, ETC.; ET AL.,**

**Defendants.**

---

**Appeals from the United States District Court**
**for the Eastern District of Louisiana**

---

Before SMITH and BARKSDALE, Circuit Judges, and DUPLANTIER, District Judge.[*]

RHESA H. BARKSDALE, Circuit Judge:

These consolidated interlocutory appeals are from admiralty proceedings that arise out of the bankruptcy of New Commodore Cruise Lines and its vessel-owning affiliates and concern maritime lien claims by creditors of two Commodore cruise ships. Primarily at issue are: (1) whether denying intervention by two maritime lien claimants for one of those two vessels constituted an abuse of discretion; and (2) whether the surety for a passenger vessel surety bond has a maritime lien on both vessels. **AFFIRMED.**

---

[*] District Judge for the Eastern District of Louisiana, sitting by designation.

In December 2000, Commodore and its vessel-owning affiliates filed for Chapter 11 bankruptcy in the Southern District of Florida. Two of Commodore's cruise ships, the M/V ENCHANTED ISLE and the M/V ENCHANTED CAPRI, were then stranded in New Orleans, Louisiana, and subject to the automatic bankruptcy stay. The bankruptcy court in Florida lifted the stay so that these stranded vessels could be arrested. The district court for the Eastern District of Louisiana thus obtained admiralty jurisdiction. Each vessel had numerous creditors, with some asserting maritime liens. These interlocutory appeals concern such liens. *See generally* 1 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 9 (3d ed. 2001).

A maritime lien is a special property right in a vessel, giving the lien-holder priority over some claimants. Upon a vessel's sale by court order in an *in rem* action to enforce a lien on that vessel, all pre-existing claims in the vessel are terminated and attach in accordance with their priorities to the sale proceeds. *See* 46 U.S.C. § 31326. Proceeds go first to expenses, and fees allowed and costs taxed by the court. *See **id**.* Preferred maritime liens are then satisfied, followed by preferred mortgage liens, and then non-preferred maritime liens (except that a preferred mortgage on a foreign vessel not guaranteed under the Merchant Marine Act is subordinate to maritime liens). *See **id**.*

4

Non-maritime claims are not within admiralty jurisdiction and may not be enforced in an *in rem* proceeding. *See **id**.* Obviously, creditors prefer to have a maritime lien.

Under the United States Commercial Instruments and Maritime Lien Act (CIMLA) (formerly Federal Maritime Lien Act), any person furnishing repairs, supplies, towage, usage of drydock or marine railway, *or other necessaries*, to any foreign or domestic vessel has a maritime lien on that vessel. 46 U.S.C. §§ 31301, 31342.

> [A] person providing necessaries to a vessel on the order of the owner or a person authorized by the owner —
>
> > (1) has a maritime lien on the vessel;
> >
> > (2) may bring a civil action in rem to enforce the lien; and
> >
> > (3) is not required to allege or prove in the action that credit was given to the vessel.

46 U.S.C. § 31342(a).

Maritime liens for necessaries "developed as a necessary incident of the operation of vessels". ***Silver Star Enter., Inc. v. Saramacca MV***, 82 F.3d 666, 668 (5th Cir. 1996) (internal quotation omitted). They "secure[ ] creditors who provide supplies which are necessary to keep the ship going". ***Id**.* (internal quotation omitted).

> Because a ship moves from place to place, it is peculiarly subject to the vicissitudes that would compel abandonment of the vessel or voyage, unless repairs and supplies are

5

> promptly furnished. Moreover, a ship is often
> absent from her home port without access to
> funds and, as a result, must be able to obtain
> upon her own account needed repairs and
> supplies. That and the resulting need to
> ensure that a ship did not sail away from its
> debts contributed to the creation of the
> maritime lien.

*Racal Survey U.S.A., Inc. v. M/V COUNT FLEET*, 231 F.3d 183, 187
(5th Cir. 2000)(internal citation omitted), *cert. denied*, 532 U.S.
1051 (2001).

The lien arises in favor of the creditor by operation of law
and grants the creditor the right to appropriate the vessel, have
it sold, and be repaid the debt from the proceeds. *Silver Star
Enter.*, 92 F.3d at 668. The lien is against the vessel and only
indirectly connected with the owner. *Equilease Corp. v. M/V
SAMPSON*, 793 F.2d 598, 602 (5th Cir.), *cert. denied*, 479 U.S. 984
(1986). "The maritime lien concept thus somewhat personifies a
vessel as an entity with potential liabilities independent and
apart from the personal liability of its owner". *Id*.

### A.

The M/V ENCHANTED ISLE (ISLE), the first Commodore vessel at
issue, was owned by Almira Enterprises, a Commodore affiliate. The
ISLE's creditors include, among others, several of the key parties
in these consolidated actions: Effjohn International Cruise
Holdings, Inc.; Freret Marine Supply; Cusimano Produce Co.; and
Amwest Surety Insurance Co. and Swiss Reinsurance America Corp.

6

(Swiss Re; it and Amwest are collectively referred to as the Sureties).

*Effjohn* has three claims; at issue is the one it was not permitted to add to the proceedings. The first claim concerns its loan to Almira, secured by a foreign preferred ship mortgage bearing against the ISLE. (At the time of the bankruptcy, Almira owed Effjohn principal of approximately $4 million.) For this loan, Effjohn asserts an *in rem* claim against the ISLE. The second claim is a maritime lien for custodial expenses (wharfage, insurance, and related expenses advanced while the vessel was in legal custody of the bankruptcy court) and crew wage and related expenses (payments to, and repatriation of, the stranded crew). Finally, for its third claim, *at issue here*, Effjohn seeks to assert domestic maritime lien claims it acquired from former ISLE creditors by assignment and subrogation for approximately 50 cents on the dollar. It was not permitted to do so.

*Freret* provided supplies to the ISLE, on the credit of the vessel, worth approximately $120,000. It claims "necessaries" protection under 46 U.S.C. § 31342(a)(1).

*Cusimano* is a New Orleans produce company. Between October and December 2000, Cusimano provided fresh produce and supplies worth approximately $65,000 to the ISLE, for which it was not paid. Cusimano claims a maritime lien for necessaries based on the

supplied produce.  It was not permitted to intervene to make this claim.

*The Sureties* issued a Federal Maritime Commission Passenger Vessel Surety Bond (the bond) to Commodore to cover its vessels, including the ISLE and the M/V ENCHANTED CAPRI, discussed *infra*. The bond provided security for passengers who pre-paid for cruises on one of Commodore's vessels, but who, through no fault of their own, never sailed; it required the Sureties to refund unearned passenger revenues up to $15 million if Commodore was unable to do so.  (Under 46 U.S.C. § 817e and 46 C.F.R. Part 540.1 *et seq*., a passenger vessel operator must post such a bond or otherwise prove financial responsibility.)  *Swiss Re* reinsured the bond and was a co-surety with Amwest.  The Sureties claim a maritime lien for necessaries against the ISLE, based on the bond.  (As discussed *infra*, they have the same claim against the M/V ENCHANTED CAPRI.)

Commodore's bankruptcy filing was in December 2000.  In late August 2001, at Effjohn's request, the bankruptcy court lifted the automatic bankruptcy stay for the ISLE, so that Effjohn could arrest the vessel pursuant to Supplemental Admiralty Rule C of the Federal Rules of Civil Procedure and foreclose on its mortgage. Shortly thereafter, Effjohn filed a verified complaint and arrested the vessel.  Numerous other creditors intervened (including Freret and Amwest).

Almira was served on 4 September.  In October, at Effjohn's request, Almira was defaulted as *in rem* defendant under FED. R. CIV. P. 55(a), because Almira had expressed no interest in appearing to defend its vessel.

That same month (October 2001), Effjohn moved unopposed for an interlocutory sale, suggesting a sale date of 6 December 2001 and a minimum bid of $1.5 million.  It also requested permission to bid in its mortgage and other credits (approximately $6 million).  The motion was granted 31 October, with the sale scheduled for 6 December. (31 October was also the date of the last intervention of record.)

On 1 November 2001, Effjohn requested a second Rule 55(a) entry of default against Almira; this was against Almira in its capacity as an *in personam* defendant.  The motion was granted, with an entry of default on 8 November.

After publishing notice in compliance with Rule 55(a), Effjohn requested an entry of default against non-parties.  The motion was granted, with entry of default on 8 November against "any person, natural or juridical, who has not already intervened or filed a complaint or claim in this action".

On 21 November (approximately two weeks before the scheduled sale), the Freret claimants, having formed a syndicate of creditors and other investors, moved to increase the minimum bid and to allow the syndicate to make a credit bid at the auction.  Increasing the

9

minimum bid was denied as untimely; the unopposed credit bid request, granted.

The auction was held 6 December 2001. Effjohn was the successful bidder (approximately $2.6 million; the sale was confirmed in May 2002).

On the day before the scheduled 6 December sale, and after publishing notice as required, intervenor Amwest had moved for a Rule 55(a) entry of default against all non-parties (as had Effjohn). Shortly after the sale, Amwest's motion was granted; another Rule 55(a) entry of default against non-parties was entered on 11 December 2001. In sum, there were four entries of default, including two against non-parties.

## B.

The M/V ENCHANTED CAPRI (CAPRI) is the other Commodore vessel at issue. In January 2001, the automatic bankruptcy stay was lifted against the CAPRI; and Freret arrested the vessel under Supplemental Admiralty Rule C. Pursuant to 46 U.S.C. § 31342, Freret claimed a maritime lien for necessaries furnished the CAPRI.

As in the action against the ISLE, several other creditors intervened, including Effjohn, Cusimano, and the Sureties. At issue is the Sureties' claim for a maritime lien for necessaries, based on the Sureties' passenger vessel surety bond issued to Commodore.

10

II.

These consolidated admiralty interlocutory appeals concern maritime lien claims from different actions. First, Effjohn and Cusimano appeal the denial of their motions to intervene to assert such claims in the ISLE action. (A sub-issue concerning Effjohn is its motion to amend its complaint being construed by the district court as one to intervene. One concerning Cusimano is the district court's refusing to set aside the entry of default.) Second, the Sureties appeal the dismissal of their claims in the actions against the ISLE and the CAPRI.

A.

Denial of a motion to intervene, based on its untimeliness, is reviewed for abuse of discretion as long as the district court "articulate[s] the reason the motion was untimely", including addressing the appropriate factors. *John Doe # 1 v. Glickman*, 256 F.3d 371, 376 (5th Cir. 2001). A district court's refusal to set aside an entry of default is likewise reviewed for abuse of discretion. *CJC Holdings, Inc. v. Wright & Lato, Inc.*, 979 F.2d 60, 63 (5th Cir. 1992). Factual findings are, of course, reviewed only for clear error. *E.g.*, *id*. at 64.

1.

In the ISLE action, three days before the 6 December 2001 sale, Effjohn moved to amend its complaint. Effjohn sought to add approximately $500,000, the earlier-described claims acquired from

11

other creditors; Freret and the Sureties opposed the motion; and the district court scheduled a post-sale hearing.

In late December, post-sale and after hearing argument, the district court denied as "untimely as a matter of law", Effjohn's motion to amend. The court provided the following reasons: (1) it agreed with Freret that the motion was "an ill-disguised motion for leave to intervene" and was "not in the nature of a correction", because it "assert[ed] the claims of parties who did not timely assert claims in the ... proceedings"; (2) Effjohn sought, at a "late date", to add more than $500,000 in "new claims"; (3) the 7 November entry of default had been at Effjohn's request; (4) at Amwest's request, a second entry of default was entered 11 December; (5) the court would not permit Effjohn to "circumvent the Entry of Default and the deadline imposed for the filing of intervention" — the defaults "bar the addition of new claims" and "[s]ubrogation to claims which have been barred should place the subrogee in no better stead than the original claimants, whose interventions were barred"; and (6) the motion to confirm the sale was pending and, but for Effjohn's failure to produce acceptable security, the lien-phase of the action would have been "well on its way".

Effjohn moved the court to reconsider, asserting that, even if its motion was to intervene rather than to amend, it should have been granted. This motion, opposed by Freret and the Sureties, was

12

denied for the following reasons: (1) "it [wa]s evident that all parties were aware that this matter was swiftly approaching its anticipated conclusion and deadlines ... passed unheeded"; (2) the court had "been apprised of no circumstances that prevented those potential lien claimants with whom Effjohn was negotiating from timely asserting their claims, preserving their own right and the derivative rights of any subrogee or assignee to amend and assert the claims"; (3) "Effjohn should not be allowed to contradict the deadlines imposed against all other potential claimants"; (4) "[t]he facts, circumstances, and stage of this particular case, considered together with the posturing of the parties, who are all claimants to a limited fund, do not warrant a ruling commensurate with the default setting of Rule 15, allowing amendments to the pleadings liberally"; (5) "[t]he prejudice created by Effjohn's undue delay in attempting to add subrogated or newly assigned claims only three days prior to the sale [was] sufficiently detailed in [Freret's opposition memorandum]"; (6) even a Rule 15 motion to amend should not be granted; and (7) Effjohn had presented no new factors or changes in the controlling law.

Effjohn maintains that the district court erred: (1) in construing its motion as one to intervene — instead, it was to amend or supplement a complaint; and (2) in denying the motion.

a.

13

In claiming the motion was not for intervention, Effjohn notes it was the lead plaintiff and asserts it could not have intervened in its own action. It insists: the proper analysis would have been under Rule 15 (amend), which is more lenient than Rule 24(a) (intervene); and, under Rule 15, its motion would have been granted. The district court's construing the motion as one for intervention is a legal issue, reviewed *de novo*.

For starters, a court is not bound by how a party labels its motion. Obviously, "[t]he relief sought, that to be granted, or within the power of the court to grant, should be determined by substance, not a label". **Edwards v. City of Houston**, 78 F.3d 983, 995 (5th Cir. 1996) (en banc) (alteration in original; internal quotation omitted). As noted, this principle is more than well established. *E.g.,* **United States v. Buck**, 281 F.3d 1336, 1342 (10th Cir. 2002) ("substance of the plea should control, not the label"), *cert. denied*, 123 S. Ct. 1784 (2003). In this regard, courts have applied intervention or joinder standards to motions to amend when plaintiffs have sought, by that means, to add claims of additional parties. **Montgomery v. Rumsfeld**, 572 F.2d 250, 255 (9th Cir. 1978) (applying Rule 24 intervention standards); **Trombino v. Transit Cas. Co.**, 110 F.R.D. 139, 141 (D.R.I. 1986)(applying Rule 19 joinder standards).

Effjohn sought to add new claims of other creditors that it had acquired through assignment and subrogation (at a fifty-percent

14

discount).  Had those creditors attempted to assert the claims, rather than convey them to Effjohn, they would have had to intervene under Rule 24.  Although the claims were acquired (but not asserted) prior to the default entries, Effjohn's theory that amendment was appropriate would allow it to acquire claims post-default that could no longer be brought and assert them by amending its complaint.  Under these circumstances, the district court did not err in construing the motion as one for intervention.

b.

Effjohn next maintains that, even if its motion were for intervention, it was timely under the intervention standards. Effjohn urges that the denial should be reviewed *de novo*.  However, because the district court articulated its reasons for denying the motion as untimely (described *supra*), including discussing factors in the four-part framework for determining timeliness (described *infra*), we instead review for abuse of discretion.  *See* **Glickman**, 256 F.3d at 376.  (Again, we review factual findings only for clear error.)

Rule 24(a) governs interventions of right.  FED. R. CIV. P. 24(a); **Ruiz v. Estelle**, 161 F.3d 814, 827 (5th Cir. 1998), *cert. denied*, 526 U.S. 158 (1999).  Pursuant to that Rule, a party is entitled to such intervention if:  (1) the motion is timely; (2) the putative intervenor asserts an interest related to the property or transaction that forms the basis of the controversy in the

action into which he seeks to intervene; (3) the disposition of the action may impair or impede his ability to protect that interest; and (4) it is not adequately represented by the existing parties. *E.g., Glickman*, 256 F.3d at 375. Generally, intervention is proper "where no one would be hurt and the greater justice could be attained". **Sierra Club v. Espy**, 18 F.3d 1202, 1205 (5th Cir. 1994) (internal quotation omitted). *See generally* 6 JAMES W. MOORE, MOORE'S FEDERAL PRACTICE § 24.03[1][a], at 24-23 (Matthew Bender 3d ed. 2003).

Here, of course, the only factor at issue is timeliness. For that factor, another four-part framework is applied: (1) how long the putative intervenor knew, or reasonably should have known, of its stake in the action; (2) the prejudice, if any, the existing parties may suffer because the putative intervenor failed to intervene when it knew, or reasonably should have known, of its stake; (3) the prejudice, if any, the putative intervenor may suffer if intervention is not allowed; and (4) any unusual circumstances weighing in favor of, or against, finding timeliness. *E.g., Glickman*, 256 F.3d at 375-76. These factors are "not a formula for determining timeliness"; instead, it should be determined based on *all* the circumstances. **Id**. at 376 (internal quotation omitted). *See also, e.g.,* **Banco De Credito Industrial, S.A. v. Tesoreria General**, 990 F.2d 827, 832 (5th Cir. 1993) (timeliness is flexible, based on specific facts and circumstances,

16

and measured by "practical rather than technical yardstick"), *cert. denied*, 510 U.S. 1071 (1994).

Regarding how long Effjohn knew, or should have known, of its stake, this factor weighs heavily against intervention. We consider "the movant's failure to apply for intervention *as soon as it knew or reasonably should have known of its interest*". *E.g.*, **Lelsz v. Kavanagh**, 710 F.2d 1040, 1044 (5th Cir. 1983) (internal quotation omitted; emphasis added). The assignments to Effjohn were made between 29 June and 20 September 2001; it admits knowing of its stake in all of these additional claims on 20 September at the latest. Yet, from the date it acquired the last claim, it waited approximately two and one-half months — until 3 December, only three days pre-sale — to bring these claims to the court's attention. (This was well past the 8 November default entered at Effjohn's request.) Effjohn cites cases in which longer delays were allowed; again, however, the length of a delay allowed depends on the particular circumstances. *E.g.,* **Sierra Club**, 18 F.3d at 1205 (absolute measure of time elapsed is not relevant). As the lead plaintiff in these proceedings, Effjohn was obviously well aware of the events in the litigation and cannot claim ignorance.

Prejudice to other parties also weighs against intervention. The inquiry for this factor is whether other parties were prejudiced *by the delay*, not whether they would be prejudiced *by the addition of the claim* (obviously, in the sense that they may

17

obtain less, existing parties are always prejudiced by new claims).
*See* **Assoc. of Prof'l Flight Attendants v. Gibbs**, 804 F.2d 318, 321 (5th Cir. 1986) (intervention allowed as timely where no more distressing to other parties at late date than at earlier one). As the district court found, Freret was prejudiced by the delay because: it relied on the amounts in Effjohn's complaint in determining its bidding strategy; and had it known of these claims, it could have created a larger syndicate of investors to increase the sale price and would have been more open to settling its claims.

Concerning prejudice to the would-be intervenor, Effjohn would obviously suffer some prejudice by not being allowed to intervene because it will not be able to assert approximately $500,000 in maritime lien claims. On the other hand, the prejudice is not as severe as in many cases in which intervention has been allowed. *E.g.,* **Amberg v. Federal Deposit Ins. Corp.**, 934 F.2d 681 (5th Cir. 1991) (reversing to allow intervention where party had complied with statute); **Crabtree v. S/S JULIA**, 290 F.2d 478 (5th Cir. 1961) (reversing refusal to allow individual seaman to assert claim for maintenance and injuries); **Point Landing, Inc. v. Alabama Dry Dock & Shipbuild. Co.**, 261 F.2d 861 (5th Cir. 1958) (reversal of intervention denial where maritime lien-holder complied with conditions stated in notice and court's decree). Moreover, Effjohn is not a stranger to the litigation which became aware of its

18

substantial new claim only shortly before the sale; nor, for example, is it an unsophisticated ward of the court. In short, the prejudice to Effjohn was of its own making.

Finally, two unusual circumstances weigh against allowing intervention. First, as mentioned, Effjohn had full knowledge of the litigation and lacked good cause for delay. It maintains, apparently without record support, that processing these claims was delayed by the terrorist events of 11 September 2001 (Effjohn's New York office was apparently handling the paperwork). However, several of the assignments were received well before that date, and Effjohn's local counsel was undoubtedly aware of the existence of the claims. Yet, Effjohn failed to bring them to the court's attention until 3 December.

Second, default had been entered at Effjohn's request. (Although Effjohn did miss Amwest's deadline for claims (23 November), the second default against non-parties was entered 11 December at Amwest's request, *after* Effjohn moved to amend.) Effjohn sought to block others by imposing deadlines and an entry of default; yet, it sat on its own claims. Effjohn makes much of the fact that the default was at its own request and insists it did not intend to block itself. However, Effjohn ignores the inequity of its ensuring other parties could not bring late claims while attempting to do so itself.

Effjohn maintains that the default did not actually bar its claims, insisting:  the default entry did not apply to it, because it was already a party; and, even if the default did apply to Effjohn, it should have been set aside.  The default entry states: "DEFAULT IS HEREBY ENTERED as against any person, natural or juridical, who has not already intervened or filed a complaint or claim in this action".

These terms do not expressly apply to Effjohn; it was already a party.  But, they arguably apply to Effjohn's new claims (which, as discussed *supra*, were properly viewed as claims that had to be brought through intervention).  Regardless, the district court did not hold the claims barred by the default; it considered the default as one factor in the timeliness inquiry.  Even assuming the default technically did not apply to the claims, the purpose of the entry of default was to ensure that all claims were before the court.  Effjohn's delay in bringing new claims is unjustified in the light of the default.

Under these facts, the district court did not abuse its discretion in holding Effjohn's motion untimely.  Therefore, the addition of Effjohn's new claims was properly denied.

2.

As noted, Cusimano provided produce to the ISLE.  When Commodore and its affiliates filed for bankruptcy, claimants were required to file proofs of claim in each proceeding.  Cusimano

20

received personal notice of the bankruptcy for two of the cases (those involving Commodore and the CAPRI, *not* the ISLE) and timely filed proofs of claim in those proceedings. It neither received personal notice in the proceedings involving the ISLE nor filed a proof of claim in them. Accordingly, it did not receive notice of the bankruptcy stay being lifted and the arrest of the ISLE.

On 7 February 2002 (over two months after the sale of the ISLE), Cusimano moved to set aside the entry of default and for leave to intervene. Freret and Amwest opposed the motion. Following argument, the district court in March 2002 denied the motion, as follows:

> The Court finds that Cusimano has failed to establish *good cause* for failing to file a timely claim in this proceeding. The legal notice *published* in this matter was more than adequate, particularly given that Cusimano had *actual notice* of facts leading up to this *in rem* proceeding. *Equally important is the prejudice that the timely claimants will suffer if the default is set aside and additional claimants allowed to straggle into these proceedings*. For these reasons, and for the reasons stated at oral argument by counsel for Freret ... the Court finds that the equities weigh against setting aside the default.

(Emphasis added.)

Cusimano maintains the district court abused its discretion by refusing: (1) to set aside the entry of default; and (2) to allow intervention. (Because we determine the district court was within

21

its discretion to refuse to set aside the default, we do not reach the intervention issue.)

As stated, refusing to set aside a Rule 55(a) entry of default is reviewed for abuse of discretion. Defaults are not favored and their strict enforcement "has no place in the Federal Rules". *Amberg*, 934 F.2d at 686. (Our court has left open the question whether the standard for relief from entries of default (Rule 55(a)) is more lenient than that for a default judgment (Rule 55(b)), *CJC Holdings, Inc.*, 979 F.2d at 63 n.1; however, we generally examine the same factors. *Id*. at 64. In any event, entries of default are serious; "where there are no intervening equities[,] any doubt should ... be resolved in favor of the movant to the end of securing a trial upon the merits". *Lacy v. Sitel Corp.*, 227 F.3d 290, 292 (5th Cir. 2000) (quotation and citation omitted).)

"For *good cause shown* the court may set aside an entry of default...." FED. R. CIV. P. 55(c) (emphasis added). "[T]he requirement of 'good cause' ... ha[s] generally been interpreted liberally". *Amberg*, 934 F.2d at 685 (internal citation omitted). Three factors are examined for determining "good cause" *vel non*: (1) whether the failure to act was willful; (2) whether setting the default aside would prejudice the adversary; and (3) whether a meritorious claim has been presented. *Lacy*, 227 F.3d at 292. These factors are not exclusive; instead, they are to be regarded

22

simply as a means to identify good cause. ***Dierschke v. O'Cheskey***, 975 F.2d 181, 184 (5th Cir. 1992). Other factors may be considered, such as whether the party acted expeditiously to correct the default. ***Id.***

The first factor (willfulness) weighs in favor of the district court's not setting aside the entry of default. The court did not find that Cusimano's failure to respond was intentional; instead, it found Cusimano's neglect was *not* excusable. *See **CJC Holdings, Inc.***, 979 F.2d at 64 ("willfulness" inquiry is whether neglect excusable).

Willfulness *vel non* is a finding of fact reviewed only for clear error. *See **id***. This finding was not clearly erroneous. Cusimano states that it did not become aware of the action involving the ISLE until early February 2002, shortly before filing its 8 February intervention motion. On the other hand, Freret represents that, prior to then, Cusimano had actual notice of the action. It reasons Cusimano: (1) was a claimant in the proceedings involving the CAPRI and therefore knew of the initial underlying facts; (2) received a 20 June 2001 letter from Effjohn offering to pay 50 percent of the face value for Cusimano's claim against the ISLE and responded to that letter; and (3) received a disclosure statement in either October or November 2001 evidencing that the ISLE was the subject of admiralty proceedings. The

23

district court found Cusimano had actual notice of the facts leading up to the *in rem* proceeding for the ISLE.

Cusimano also contends it had no reason to know of the ISLE-action because it did not receive personal notice. Freret points to several publications in the *Times-Picayune* (New Orleans newspaper) that it claims constitute at least constructive notice: (1) Effjohn's 12 September 2001 publication of notice of the ISLE's arrest and the deadline for asserting new claims; (2) Amwest's 8 November publication of notice of arrest, providing a second deadline for the assertion of claims; and (3) three publications of notice of the interlocutory sale of the ISLE (16, 26, and 30 November). The district court found the published legal notice "more than adequate". In short, Cusimano's neglect was *not* excusable.

For the second factor, as earlier-quoted, the court noted the prejudice caused by allowing additional claimants "to straggle into these proceedings". As with Effjohn's claim, discussed above, there was some prejudice to other parties caused by the delay.

Regarding the third factor (meritoriousness of Cusimano's claim), there is no dispute that Cusimano would have a valid maritime lien against the ISLE. This favors setting aside the entry of default.

In sum, although entries of default are not favored, the district court did not abuse its discretion.

24

The Sureties' claims involve whether a maritime lien arises out of their bond that applied to both vessels. The Sureties intervened in the proceedings involving each vessel, asserting maritime liens for necessaries. In the ISLE proceedings, Freret and Effjohn each moved in January 2002 for summary judgment against the Sureties' claims, contending: (1) the bond was not a maritime contract; (2) the Sureties do not have maritime liens against the ISLE because the bond was not a necessary and was not provided to a particular vessel; and (3) the Sureties do not have a maritime lien through the vessel's passengers. In the CAPRI proceedings, Freret filed a similar motion, which the crew joined.

Following argument, the district court granted the motions, ruling: the bond is not a maritime contract; the Sureties do not have a maritime lien for necessaries; and the Sureties do not have a maritime lien through the passengers because the passengers do not have maritime liens.

On appeal, the Sureties maintain: (1) the bond (a) is a maritime contract (b) that gives rise to a maritime lien for "necessaries"; and (2) in the alternative, the Sureties are subrogated to the claims of the passengers, who have maritime liens against the vessels. A summary judgment is reviewed *de novo*. *E.g.,* **Taita Chem. Co., Ltd. v. Westlake Styrene Corp.**, 246 F.3d

377, 385 (5th Cir. 2001).  *See* FED. R. CIV. P. 56.  There are *no* material fact issues.

1.

For the bond, a maritime lien exists only if:  (1) the bond is a maritime contract subject to admiralty jurisdiction, *e.g., Wilkins v. Commercial Investment Trust Corp.*, 153 F.3d 1273, 1276 (11th Cir. 1998) ("Maritime jurisdiction is a prerequisite to a claim against a vessel asserting a maritime lien"); and (2) the bond is a necessary provided to a vessel, *see* 46 U.S.C. § 31342(a) ("[a] person providing necessaries to a vessel on the order of the owner [or authorized person] ... has a maritime lien on the vessel...").

Admiralty jurisdiction's boundaries for contracts are difficult to draw.  *Kossick v. United Fruit Co.*, 365 U.S. 731, 735 (1961).  "[I]n determining whether a contract falls within admiralty, the true criterion is the nature and subject-matter of the contract, as whether it was a maritime contract, having reference to maritime service or maritime transactions".  *Exxon Corp. v. Central Gulf Lines, Inc.*, 500 U.S. 603, 610 (1991) (internal quotations omitted).  The key is "whether the services ... performed [under] the contract are maritime in nature".  *Id.* at 612.  Along this line, the "character of the work to be performed" is determinative, not "the [contract's] value ... to the shipping industry".  *Planned Premium Servs. of Louisiana, Inc. v. Int'l Ins.*

26

*Agents, Inc.*, 928 F.2d 164, 166 (5th Cir. 1991) (internal citation and quotation omitted). If the "essence of the services provided" under the contract is non-maritime ("identical to or essentially similar to non-maritime services regularly performed by those not involved in the operation of vessels"), it is not a maritime contract. *Id.*

The Sureties urge a broad test for whether a contract is a maritime contract, citing *Archawksi v. Hanioti*, 350 U.S. 532 (1956), for the proposition that, where the underlying contract is maritime and the controversy grows directly out of a claim for non-performance on that contract, an admiralty court has jurisdiction, even where money damages are sought. Accordingly, they insist: the underlying contract for the transport of passengers is a maritime contract; and their claim arises out of that contract.

The Sureties take too broad a view of maritime jurisdiction. "Not every contract that relates to maritime matters warrants the invocation of admiralty jurisdiction." *Planned Premium Servs. of Louisiana*, 928 F.2d at 166. For example, "a performance bond which compensates an obligee for loss in the event of nonperformance by the principal obligor is not a maritime contract". *Aqua-Marine Constructors, Inc. v. Banks*, 110 F.3d 663, 671 (9th Cir. 1997). Quoting a maritime law treatise, *Aqua-Marine* stated:

> [A] bond securing the performance of a charter party is not a maritime contract for the purposes of admiralty jurisdiction, although

27

> the charter party itself is a maritime contract; the surety on the bond neither promises performance of the charter party nor is [s]he authorized to do so; h[er] obligation is merely to pay damages in the event of non-performance. Where, however, there is a promise to perform a charter in the default of another, there is a maritime contract.

*Id*. (citing 1 STEVEN F. FREIDELL, BENEDICT ON ADMIRALTY § 183, at 12-10 (1996)) (alterations in original).

In addition to the district court in this case, at least one other court has addressed directly whether a passenger vessel surety bond is a maritime contract. *See **Patricia Hayes & Associates, Inc. v. M/V BIG RED BOAT, II***, 2002 A.M.C. 1722 (S.D.N.Y. 2002). Relying on ***Fednav, Ltd. v. Isoramar, S.A.***, 925 F.2d 599 (2nd Cir. 1991) (vessel owner's agreement to contribute to lessee's settlement of claim not maritime contract because subject matter of suit was covenant to pay damages) and ***Pacific Surety Co. v. Leatham & Smith Towing & Wrecking Co.***, 151 F. 440 (7th Cir. 1907) (bond between surety and charterer to guarantee charterer's performance of charter party not maritime contract), it held: a passenger vessel surety bond, under which sureties "merely agreed to refund passenger monies for unperformed cruises on [the vessel]", was not a maritime contract and thus could not give rise to a maritime lien. *Patricia Hayes*, 2002 A.M.C. 1722.

The Sureties maintain that ***Aqua-Marine*** and ***Patricia Hayes*** conflict with ***New England Marine Insurance Co. v. Dunham***, 78 U.S.

28

1 (1870), which held that a contract of marine insurance was a maritime contract giving rise to maritime jurisdiction. They contend maritime insurance is indistinguishable from surety obligations: like the bond at issue, an insurance policy is an agreement to pay the debts of the vessel or its owner which have been contracted under maritime law.

Although insurance creates an obligation for the insurer to pay damages, rather than to perform the insured's obligations, it is distinguishable. Maritime insurance insures against the considerable "risks of navigation" faced by vessels; these risks have been long-regarded as maritime and insuring against them has been part of the "general maritime law of the world". *Dunham*, 78 U.S. at 33-34. By contrast, the passenger surety bond is *not* a well-established part of maritime law and can only be drawn upon in the event of non-navigation. Moreover, the Supreme Court has acknowledged (post-*Dunham*) that merely agreeing as surety "to pay damages for another's breach of a maritime charter is not [a maritime contract]" while "a contract ... to insure a ship ... is maritime". *Kossick*, 365 U.S. at 735.

The service to be performed under the bond (reimbursing those who made a deposit for a cruise but never sail) is non-maritime in nature. The bond is a consumer protection measure, with no direct relationship to the operation of the vessel. The bond does not relate to the carriage of passengers; it merely makes good on the

29

owners' financial obligations by reimbursing the passengers if the cruise is not performed. In sum, there is nothing inherently maritime about the Sureties' business or the bond. Accordingly, it does not fall within admiralty jurisdiction.

2.

*In the alternative*, the Sureties claim they have a maritime lien because they are subrogated to claims of pre-paid prospective passengers. Of course, the Sureties do not have a maritime lien if the passengers, involved in this regard in an executory contract, do not have one. They do not.

An executory contract, of course, is one that has yet to be fully performed. For example, when passengers pay in advance for a cruise, the tickets issued them in exchange are wholly executory until the passengers board the ship and embark.

> The breach of an executory contract does not create a maritime lien. This legal principle has gained universal acceptance in American law, and is applied in contracts involving the carriage of goods, transportation of passengers, and the provision of supplies, repairs, and services to a vessel.

SCHOENBAUM at § 9-2. *See also **BargeCarib, Inc. v. Offshore Supply Ships, Inc.***, 168 F.3d 227, 230 (5th Cir. 1999) ("[b]reach of a time charter by the owner gives rise to a maritime lien as long as the vessel has been delivered to the charterer *and the contract is no longer executory*" (emphasis added)); ***E.A.S.T., Inc. of Stamford v. M/V ALAIA***, 876 F.2d 1168, 1174 (5th Cir. 1989) (executory contract

30

doctrine "precludes the creation of a maritime lien for breach of a contract that is merely executory" as a "maritime lien is based ... on the fiction that the vessel may be a *defendant* in a breach of contract action when the vessel itself has begun to perform under the contract" (emphasis in original)); ***Belvedere v. Compania Plomari De Vapores***, 189 F.2d 148 (5th Cir. 1951) (no *in rem* claim for failure to transport cargo where voyage not completed because of engine trouble, because no cargo was loaded and vessel was never ready to receive it at the loading port).

The executory contract rule applies to contracts for passage aboard vessels; and if "the vessel repudiates the contract before passengers have boarded ... there is no lien for return of prepaid passage money". SCHOENBAUM at § 9-2. Likewise, ***Todd Shipyards Corp. v. THE CITY OF ATHENS***, 83 F. Supp. 67 (D. Md.), *aff'd*, 177 F.2d 96 (4th Cir. 1949), held that passengers who had not "boarded the ship for transportation" did not have a maritime lien against the ship for nonperformance of transportation obligations.

> [E]ven if we assume that a common carrier may be sued in tort for failure to fulfill an executory obligation to a passenger, who did not come within the care or control of the carrier[,] ... it does not follow that a breach of such executory contract creates a lien in rem. Thus it may well be that the shipowner in the present case may be sued in tort by the prospective passengers either in the civil courts or even in personam in admiralty, but they have no maritime lien to enforce in rem against the ship. The shipowner, and not the ship as an entity, is the common carrier. The obligation to

31

> transport passengers either in accordance with
> a previous contract or advertised schedule is
> not the obligation of the vehicle used for
> transportation, but of the owner or operator
> of the vehicle.

*Id*. at 76 (internal citations omitted). It noted the detrimental

effect granting passengers maritime liens could have on maritime

commerce.

> It is highly important that a ship, especially
> in a foreign port, be able to obtain supplies
> or repairs on its own credit in order to
> continue its voyage. It is for this purpose
> among others, that admiralty law has created
> the maritime lien. *The credit is extended on
> the faith of the value of the ship itself*, and
> in further support of that credit the
> admiralty law gives priority to the last lien
> rather than to prior liens. ... [I]f the
> passenger claims are to be established as
> maritime liens in tort, they would also
> apparently outrank for priority of payment,
> liens for very necessary repairs to the ship
> in a foreign port. Since any duty to the
> prospective passengers is imposed only on the
> shipowner, the grant of a maritime lien for
> any breach of that duty would be inconsistent
> with the definition and purpose of that type
> of lien, would destroy the purpose and policy
> of the lien and would make it synonymous with
> a right in personam.

*Id*. at 76 (emphasis added).

Claiming that this executory contract doctrine is outdated,

the Sureties assert that we should disregard it and create a

maritime lien in favor of passengers. They cite no cases in

support of their position, but urge that Congress has shown an

inclination to protect consumers who contract with cruise ship

operators. In so doing, they point to 46 U.S.C. § 817e (enacted in

32

1966, post-***Todd Shipyards***), which, as stated, requires the operators to reimburse passengers when a cruise does not occur and to post a bond or otherwise show financial responsibility concerning that reimbursement obligation.

If anything, Congress' enacting 46 U.S.C. § 817e demonstrates there is no maritime lien on pre-paid passenger fares. Congress was well aware of the lack of protection for potential passengers and acted to address it. In other words, Congress (through § 817e) provided passengers with financial protection in the event their cruises were cancelled, alleviating any need for a maritime lien. Congress was capable of creating — but did *not* create — such a lien in favor of passengers.

In sum, prospective passengers with possible breach of contract claims against Commodore for cancelled cruises on the ISLE or the CAPRI do not have a maritime lien against either vessel. Accordingly, the Sureties, to the extent they *might* be subrogated to such claims, have none.

### III.

For the foregoing reasons, the denial of Effjohn's motion to amend its complaint (in reality, to intervene); the denial of Cusimano's motion to intervene; and the dismissal of the Sureties' claims are **AFFIRMED**.

*AFFIRMED*

33