ACCEPTED
01-14-00246-CV
FIRST COURT OF APPEALS
HOUSTON, TEXAS
7/1/2015 4:20:55 PM
CHRISTOPHER PRINE
CLERK

## NO. 01-14-00246-CV

## IN THE COURT OF APPEALS FOR THE FIRST JUDICIAL DISTRICT AT HOUSTON, TEXAS

FILED IN
1st COURT OF APPEALS
HOUSTON, TEXAS
7/1/2015 4:20:55 PM
CHRISTOPHER A. PRINE
Clerk

## ALLEN L. BERRY, JOSEPH D. McCORD, AND ROBERT G. TAYLOR, II

*Appellants*

## vs.

## ENCORE BANK

*Appellee*

On Appeal from the 152nd Judicial District Court
Of Harris County, Texas
Case No. 2010-63264

## MOTION FOR REHEARING

Jett Williams III
State Bar No. 21554000
JWilliams@HenkeLawFirm.com
Kathleen H. Boll
State Bar No. 00798431
KBoll@HenkeLawFirm.com
Charlie Henke
CHenke@HenkeLawFirm.com
State Bar No. 00784254
**HENKE & WILLIAMS**
3200 Southwest Freeway
34th Floor
Houston, Texas 77027
Telephone: (713) 940–4500
Facsimile: (713) 940–4545

**ATTORNEYS FOR APPELLANT
JOSEPH D. McCORD**

Robert G. Taylor, III
State Bar No. 19721100
**LAW OFFICE OF ROBERT G.
TAYLOR, III**
4119 Montrose, Suite 400
Houston, Texas 77006
Telephone:     (713) 654-7799
Facsimile:     (713) 654-7814

**ATTORNEYS FOR APPELLANT
ROBERT G. TAYLOR, II**

Jerry S. Payne
State Bar No. 15658000
616 Voss Road
Hunters Creek Village, Texas 77024
Telephone:     (713) 785-0677
Facsimile:     (713) 781-8547

**ATTORNEYS FOR APPELLANT
ALLEN L. BERRY**

**ORAL ARGUMENT REQUESTED**

**TABLE OF CONTENTS**

**NO. 01-14-00246-CV**

**IN THE COURT OF APPEALS FOR THE
FIRST JUDICIAL DISTRICT AT
HOUSTON, TEXAS**

**ALLEN L. BERRY, JOSEPH D. McCORD,
AND ROBERT G. TAYLOR, II**
*Appellants*

**vs.**

**ENCORE BANK**
*Appellee*

On Appeal from the 152nd Judicial District Court
Of Harris County, Texas
Case No. 2010-63264

**MOTION FOR REHEARING**

**TABLE OF CONTENTS**

TABLE OF CONTENTS.............................................................................................i

INDEX OF AUTHORITIES...................................................................................... ii

STATEMENT OF THE CASE....................................................................................2

ISSUES PRESENTED FOR REVIEW .....................................................................3

ARGUMENT AND AUTHORITIES.........................................................................4

    I.    THIS COURT FINDS APPELLEE'S CLAIMS ACCRUED ON MARCH 15, 2012, LONG AFTER THIS SUIT WAS FILED ……………………………………………….......................................4

II.   THE COURT ERRONEOUSLY FINDS THAT BROAD WAIVER LANGUAGE CONSTITUTES CONTRACTUAL ASSUMPTION OF THE RISK OF THE MISTAKE ……………………………………...7

III.  THE MARCH 15, 2010 CONSENT OF GUARANTORS REVIVED ANY OF APPELLANTS' CLAIMS RELEASED, MODIFIED, OR WAIVED IN EARLIER CONTRACTS………...............................14

IV.   THE ECONOMIC LOSS RULE DOES NOT BAR GUARANTORS' CLAIMS FOR DAMAGES THAT WERE NOT THE SUBJECT OF ANY CONTRACT BETWEEN THE GUARANTORS AND THE BANK ……...…………………………………………..15

V.    APPELLEE MATERIALLY ALTERED THE TERMS OF THE LOAN, THEREBY RELEASING GUARANTORS FROM THEIR OBLIGATIONS UNDER THE GUARANTY AGREEMENT……..19

CONCLUSION ............................................................................................20

PRAYER ....................................................................................................21

CERTIFICATE OF SERVICE ...................................................................24

CERTIFICATE OF COMPLIANCE ...........................................................25

# INDEX OF AUTHORITIES

**Page**

*Bolle, Inc. v. American Greetings Corp.,*
109 S.W.3d 827 (Tex. App.—Dallas 2003)…………………………………..12

*City Bank v. Compass Bank*,
2010 U.S. Dist. LEXIS 66260 *5 (W.D. Tex. 2010)………………………16

*Colonial Sav. Ass'n v. Taylor*,
544 S.W.2d 116 (Tex. 1976)………………………………………………..15

*De Monet v. Pera*,
877 S.W.2d 352 (Tex. App.—Dallas 1994)………………………………..13

*El Paso Field Services v. Mastec N.A.*,
389 S.W.3d 802 (Tex. 2012)………………………………………………..15

*English v. Fischer*,
660 S.W.2d 521 (Tex. 1983)………………………………………………..16

*Equistar Chems., L.P. v. Dresser-Rand Co.,*
240 S.W.3d 864 (Tex. 2007)…...…………………………………………...18

*FDIC v. Attayi*,
745 S.W.2d 939 (Tex. App. —Houston
[1st Dist.] 1988, no writ)……………………………………………………19

*Federal Land Bank Ass'n of Tyler v. Sloane*,
825 S.W.2d 439 (Tex. 1991)…………………………………….…..…..16, 17

*Geodyne Energy Income Prod. P'ship I-E v. Newton Corp.,*
161 S.W.3d 482 (Tex. 2005)……………………….…………….…7, 8, 9, 10

*Lamar Homes, Inc. v. Mid-Continent Cas. Co.,*
242 S.W.3d 1 (Tex. 2007)…………………………………………………..18

*Lawyers Title Inc. Corp. v. Northeast Texas Dev. Co.*,
635 S.W.2d 897 (Tex. App.—Tyler 1983, writ ref'd n.r.e.)…………...……19

*Med. City Dallas, Ltd. v. Carlisle Corp.,*
    251 S.W.3d 55 (Tex. 2008)…………………………………………………..18

*Mission Petroleum Carriers, Inc. v. Solomon*,
    106 S.W.3d 705 (Tex. 2003)……………………………………………..16

*Murray v. San Jacinto Agency*,
    800 S.W.2d 826 (Tex. 1990)…………………………………………………6

*Old Colony Ins. Co. v. City of Quitman*,
    352 S.W.2d 452 (1961)………………………………………..…………19

*½ Price Checks Cashed v. United Auto. Ins. Co.,*
    344 S.W.3d 378 (Tex. 2011)………………………………………………18

*Seureau v. Exxon Mobil Corp.*,
    274 S.W.3d 206 (Tex. App.—Houston
    [14th Dist.] 2008, no pet.)..…………………………………………...6

*Sharyland Water Supply Corp. v. City of Alton*,
    354 S.W.3d 407 (Tex. 2001)……………………………………………..18

*Torrington Co. v. Stutzman*,
    46 S.W.3d 829 (Tex. 2000)…………………………………………………15

*Vastine v. Bank of Dallas*,
    808 S.W.2d 463 (Tex. 1991)……………………………………………..19

*William v. Glash,*
    789 S.W.2d 261 (Tex. 1990)……………………………………7, 11, 12

## STATUTES AND RULES

TEX. CIV. PRAC. & REM. CODE §16.004(a)(3) ........................................................6

TEX. R. APP. P. 49.1.........................................................................................2

RESTATEMENT (SECOND) OF CONTRACTS §154 (1981)……………............7

RESTATEMENT (SECOND) OF TORTS §552B (1977)…………………………16

**IN THE COURT OF APPEALS FOR THE
FIRST JUDICIAL DISTRICT AT
HOUSTON, TEXAS**

**ALLEN L. BERRY, JOSEPH D. McCORD,
AND ROBERT G. TAYLOR, II**
*Appellants*

**vs.**

**ENCORE BANK**
*Appellee*

On Appeal from the 152nd Judicial District Court
Of Harris County, Texas
Case No. 2010-63264

**MOTION FOR REHEARING**

Pursuant to Texas Rule of Appellate Procedure 49.1, APPELLANTS ALLEN L. BERRY, JOSEPH D. McCORD, and ROBERT G. TAYLOR, II (hereinafter collectively referred to as "Appellants" or "Guarantors") submit this, their ***Motion for Rehearing*** and respectfully request that this Honorable Court grant Appellants' ***Motion for Rehearing***, withdraw the June 2, 2015 ***Opinion*** and issue a new opinion reversing the trial court's judgment.[1]

---

[1] Simultaneous with the filing of this motion, Appellants have filed a ***Motion for En Banc Reconsideration***.

## STATEMENT OF THE CASE

Appellants are Allen L. Berry, Joseph D. McCord, and Robert G. Taylor, II. Appellee is Encore Bank (hereinafter referred to as "Appellee" or "the Bank").

A panel of the Court issued the Opinion in this case on June 2, 2015. A copy of the Opinion is attached as Appendix A. The panel that rendered the judgment in this case consisted of Justices Keyes, Higley and Brown.

This *Motion for Rehearing* may be granted by a majority of the justices who participated in the decision of the case. TEX. R. APP. P. 49.3.

In denying Appellants' limitations defense, the Court found Appellee's claims accrued in March 2012, many months after this suit was filed in September 2010. Additionally, the Court's Opinion contains a fundamental error in that it ignores and gives no effect to the March 15, 2010 Consent of Guarantors, which expressly revives claims the Court found barred by earlier contracts between the parties. The Court also gave overbroad application to the economic loss rule, barring recovery by Appellants of damages that are not the subject of any contract with Appellee. The Court has disregarded the fact that, by its acts and omissions, Appellee materially altered the terms of the underlying loan, thereby again denying Appellants any relief. Furthermore, the ruling that broad waiver language constitutes contractual assumption of the risk of mistake significantly alters the remedy of mutual mistake.

2

The errors in the Courts' Opinion are set forth more fully below.

## ISSUES PRESENTED FOR REVIEW

**ISSUE ONE:** Whether the Court erred in determining that Appellee's claim against Appellants accrued on March 15, 2012, despite the fact that Appellee filed this suit eighteen months earlier on September 27, 2010, relying on a breach of the Guaranty Agreements that occurred in March 2008.

**ISSUE TWO:** Whether the Court erred in ruling that broad waiver language in the original loan documents constitutes contractual assumption of the risk by Appellants of any mistake in the parties' transactions.

**ISSUE THREE:** Whether the Court erred in concluding that the Appellants waived all claims and defenses in the original loan documents and Guaranty Agreements, without addressing language in the March 15, 2010 Consent of Guarantors expressly reviving Appellants' claims.

**ISSUE FOUR:** Whether the Court erred in determining that the economic loss rule bars the Appellants' negligence counterclaims when the Appellants have lost the value of their investment, which is not the subject of any contract between the Appellants and Appellee.

**ISSUE FIVE:** Whether Appellee materially altered the terms of the loan, thereby releasing Guarantors from their obligations under the Guaranty Agreements.

## ARGUMENT AND AUTHORITIES

### I.
### THIS COURT FINDS APPELLEE'S CLAIMS ACCRUED ON MARCH 15, 2012, LONG AFTER THIS SUIT WAS FILED.

The timeline for the purposes of limitations is as follows:

**March 28, 2007**   Loan transaction closed. (CR Vol. 2 at 821-23; Vol. 3 at 817-32, 836-43, 847-70);

**March 26, 2008**   Material Breach of the Guaranty Agreement - Appellee received notice that Borrower was in default on its payment obligations to the shipyard. (CR Vol. 3 at 885-87; Vol. 4 at 1440; Vol. 5 at 1782).

**April 15, 2009**   First note modification agreement and consent of guarantors. (CR Vol. 1 at 388-90);

**March 15, 2010**   Second note modification agreement and consent of guarantors. (CR Vol. 1 at 134-38);

**Sept. 27, 2010**   This suit filed against Appellants. (CR Vol. 1 at 14);

**March 26, 2012**   Limitations on Appellee's claims for breach of contract and guaranty expired. (CR Vol. 4 at 1432, 1450, 1516).

**July - Aug. 2012**   Appellants served (CR Vol. 1 at 153-60, 357-58; Vol. 4 at 1432; Vol. 5 at 1765, 1773, 1778).

As set forth in Appellee's *Original Petition* filed on September 27, 2010 and all subsequent pleadings in this case, the Guaranty Agreement was originally breached by events occurring no later than March 26, 2008. (CR Vol. 3 at 888-890, 891-892; CR Vol. 5 at 1782). More specifically, Appellee alleged that:

"BLyn is in breach of its obligations under the Loan Documents…
Due to a dispute regarding the progress of the repair and refurbishment

4

projects, BLyn ceased payment of invoices issued by Crimson in March of 2008. . . **An event of default has occurred under the Loan Documents and the Guaranty Agreements**"

(CR Vol. 1 at 13) (emphasis added).

Under the Guaranty Agreement, Appellants guarantee performance by Borrower of all obligations undertaken by Borrower under the Loan Documents. (CR Vol. 1 at 252, ¶ 1), and there is a default under the Guaranty Agreement if Borrower does not meet any of such obligations. (CR Vol. 1 at 255, ¶ 13). Borrower defaulted on certain of its obligations no later than March 26, 2008, and this also constituted a breach of the Guaranty Agreements. (CR Vol. 3 at 884-87, 888-90, 891-92; CR Vol. 5 at 1782). This is not a "hypothetical breach," and it is not merely a breach by Borrower. **Appellee brought this suit against Appellants for *this* breach on September 27, 2010** but did not serve Appellants until almost two years later in July and August 2012, after the statute of limitations had run. (CR Vol. 1 at 14, 153-60, 357-58; Vol. 4 at 1432; Vol. 5 at 1765, 1773, 1778). However, when faced with Appellants' statute of limitations defense, Appellee argued that the second extended maturity date of March 15, 2012 was the date its claims accrued. In its Opinion, the Court adopts Appellee's strained reasoning (App. A at 12-13) but fails to address how limitations can accrue on a claim some eighteen months **after** suit is brought on that claim.

The only claim ever asserted against Appellants in this case is breach of the Guaranty Agreements. As a matter of fact, logic, and Texas law, Appellee's claim for breach of the Guaranty Agreements had to accrue before it was filed. No claim could be filed before facts came into existence that authorized Appellee to seek a judicial remedy. *Murray v. San Jacinto Agency*, 800 S.W.2d 826, 828 (Tex. 1990).

At the time suit was filed, the contract was complete, and the material breach had taken place. As with every contract in the State of Texas, the limitations period started running on the date of the breach, no later than March 26, 2008. TEX. CIV. PRAC. & REM. CODE §16.004(a)(3) (West 2002).

When the defendant's conduct produces a legal injury, however slight, the cause of action accrues and limitations begin to run. *See Seureau v. Exxon Mobil Corp.*, 274 S.W.3d 206, 226 (Tex. App.—Houston [14th Dist.] 2008, no pet.). Once there was any default under the Guaranty Agreement constituting a legal injury, the limitations began. According to **<u>Appellee's</u>** pleadings in this case, that occurred in March 2008, and Appellee sued Guarantors for the full amount due on the loan on September 27, 2010.

To the extent Appellee argues or the Court has found that the April 2009 and March 2010 loan modifications or extensions, somehow "wiped the slate clean" with respect to prior breaches of the Guaranty Agreements, Appellee certainly did

6

not recognize this when it filed this suit against Appellants in September 2010 for breaches occurring before the modifications.

Appellants respectfully request that this Court grant its ***Motion for Rehearing***, withdraw the June 2, 2015 Opinion, reverse the trial court and render judgment that Appellee's claims are barred by limitations.

## II.

### THE COURT ERRONEOUSLY CONCLUDES THAT BROAD WAIVER LANGUAGE CONSTITUTES CONTRACTUAL ASSUMPTION OF THE RISK OF THE MISTAKE.

This Court's opinion erroneously concludes that Guarantors' defense of mutual mistake is not available because guarantors contractually assumed the risk of the mutual mistake due to broad waiver language in the loan documents. There was a mutual mistake between the parties because Crimson had a priority lien on the vessel.

The opinion mistakenly relies on the Texas Supreme Court's opinion in *Geodyne Energy Income v. Newton Corp.,* 161 S.W.3d 482 (Tex. 2005), with references to *Williams v. Glash,* 789 S.W.2d 261, 264 (Tex. 1990) and Restatement (Second) of Contracts Section 154. These authorities do not support the Court's conclusion. The Court reasoned:

> While we agree that a mutual mistake of fact can provide a basis for avoiding a contractual obligation…..that right can be overridden by the parties' agreement: "A person who intentionally assumes the risk of unknown facts cannot escape a bargain by alleging mistake or

7

misunderstanding." *Geodyne v. Newton Corp.,* 161 S.W.3rd 482 (Tex. 2005); *accord Williams v. Glash,* 789 S.W.2d 261, 264 Tex. 1990). In *Geodyne* the Texas Supreme Court rejected the assertion of mutual mistake in light of section 154 of the Restatement, which provides that a party bears the risk of a mistake when

(a)    the risk is allocated to him by agreement of the parties, or

(b)    he is aware, at the time of the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his knowledge as sufficient….

(App. A at 18) (citations omitted). The Court then concludes, as a matter of law, that broad waiver language in the loan documents giving the bank options in handling the collateral qualifies as a contractual assumption of the risk of the mistake. The Court said: "We conclude that the guarantors contractually assumed the risk of a mistake that would leave the parties without access to the collateral. *See Geodyne*, 161 S.W.3d at 491. Accordingly, they may not avoid their contractual obligations by asserting a mutual-mistake defense." (App. A at 20).

The Court errs by misstating the scope and materiality of the mistake: "It is this superior lien position that allowed Crimson to take possession of and sell the yacht, denying…guarantors the benefit of the collateral to offset their obligations to Encore." (App. A at 14). However, the materiality of Crimson having a priority lien was far more significant than the mere value of the vessel to offset the obligation to Appellee. The summary judgment evidence shows that Crimson having the priority lien left the Guarantors and Appellee "sitting ducks" due to Crimson's ability to summarily arrest the vessel even if all repair costs were paid.

8

Neither Guarantors nor Appellee would have executed the loan documents if Crimson's lien was known. (*See* Brief of Appellants at 32-34; CR Vol. 5 at 1795-98).

The Court's holding is contrary to established law in Texas concerning contractual assumption of the risk of mutual mistake and significantly alters the remedy of mutual mistake. Texas courts have consistently held that contractual assumption of the risk under Restatement § 154(a) is applicable only when the agreements specifically allocate the risk; that broad language is not the same as specific allocation of risk under § 154(a).

*Geodyne* undercuts this Court's ruling that guarantors contractually assumed the risk of Crimson having a priority lien. *See* 161 S.W.3d 482 (Tex. 2005). *Geodyne* was a case of first impression and multiple amici filed briefs asking the court for clarification on causations and on affirmative defenses. *Id.* at 483. The Court held that a quitclaim deed does not make representation as to validity of title and that a buyer has no claim for "mistake" as to validity of title, as a matter of law. *Id.* at 486. In *Geodyne*, the buyer sought rescission of a contract under the Texas Securities Act ("TSA") alleging misrepresentations in the sale of securities. *Id.* at 483-84. The contract involved the sale of offshore mineral interests by quitclaim deed. *Id.* The Court found that "the only misrepresentation pleaded…was that [the seller] represented it was selling a ten percent in a valid lease." *Id*. at 485. The

Court specifically disagreed with the Court of Appeals' conclusion that seller misrepresented that it was selling ten percent interest in a valid lease. *Id.* at 486. The Court reasoned that a purchaser of a quitclaim deed cannot claim the deed was a misrepresentation that the lease was valid. *See id.* at 484-88. "By offering only a quitclaim deed, [the seller] *disclosed* that what it was selling might turn out to be nothing." *Id.* at 488 (emphasis in original).

The Court also addressed the Court of Appeals' denial of seller's claim for well-abandonment costs. *Id.* at 489-90. Having ruled against rescission of the contract under the TSA, the Court applied the terms of the contract, which specifically placed well-abandonment costs on buyer:

> **[A] quitclaim deed cannot be set aside on either basis under these facts. A person who intentionally assumes the risk of unknown facts cannot escape a bargain by alleging mistake or misunderstanding. The Restatement gives the precise example of quitclaim deeds to <u>illustrate this principle</u>…**
>
> As the deed here purports to transfer Geodyne's interest whatever that might be, Newton's assumptions that the lease was valid was neither a mutual mistake nor a mutual misunderstanding.

*Id.* at 490 (emphasis added).

The *Geodyne* Court did not reverse the Court of Appeals based on Restatement § 154(a); rather, it ruled that there was no mutual mistake, as a matter of law. Because there is no mutual mistake, there is no issue as to assumption of the risk of the mistake. However, the court's conclusion in *Geodyne* is consistent with

10

the established law in Texas that contractual assumption of the risk occurs only when the agreements specifically allocate the risk of the mistake. In *Geodyne,* unlike this case, the agreements specifically allocated the risk of the mistake (the risk of invalid title) to the buyer by conveying a quitclaim deed.

*Williams v. Glash* does not support this Court's conclusion that guarantors contractually assumed the risk of Crimson having a priority lien on the vessel. *See* 789 S.W.2d 261, 263 (Tex. 1990). The issue in *Glash* was whether a release for personal injuries barred a subsequent suit for injuries unknown at the time of signing. *Id.* at 262. In *Glash* the language of the release specifically released personal injury claims. *Id.* at 263-64. Nevertheless, the court reversed the Court of Appeals and remanded for fact findings, holding that the facts and circumstances surrounding the execution of the agreement create fact issues as to the parties' intent when executing the contract of release. *Id*. at 263-65. Although the law of mutual mistake does not preclude a person from intentionally assuming the risk of unknown facts, whether the parties to a release intended to cover unknown facts cannot always be determined exclusively by reference to the language of the agreement itself. *Id.* at 264. It may require consideration of the conduct of the parties and the information available to them at the time the contract is made. *Id.* "The question of mutual mistake is determined…solely by objective circumstances surrounding execution of the release," such as the parties' knowledge at the time of

11

signing and the extent of negotiations and discussions relating to the subject of the mistake. *Id.* The court held that there was sufficient evidence to establish the existence of a genuine issue of fact as to the parties' intent when entering the contract. *Id.*

In the case before this Court the summary judgment evidence shows that neither party intended to allocate the risk of Crimson having a priority lien on the vessel, because neither party had knowledge of Crimson's lien.

*Bolle, Inc. v. American Greetings Corp.* supports guarantors' argument on assumption of risk. *See* 109 S.W.3d 827 (Tex. App.—Dallas 2003). After a bench trial the court found a mutual mistake of fact and rescinded the settlement agreement. *Id.* at 829. The mistake was failing to consider an unrelated lawsuit in California between the same parties. *Id.* The appellant claimed that the appellee contractually assumed the risk of the mistake based on broad language in the settlement agreement. *Id.* at 830-831. The Court rejected appellants' argument that appellees' knowledge of the California cases precluded a holding of mutual mistake.

> Appellants argue that appellee knowingly assumed the risk of failing to consider another lawsuit when they agreed to broad release language…. the Settlement Agreement does not specifically allocate the risk of forgetting about or failing to consider an unrelated lawsuit to either party in this action. Broad release language is not the same as specific allocation of a risk.

The heart of the mutual mistake issue is whether the parties—by employing broad language within the settlement agreement—released the cases without intending to do so. Having knowledge that the California litigation existed whether that knowledge is actual or imputed does not rule out mutual mistake.

\*\*\*

The alleged mistake did not involve the meaning or scope of any language in the release; it involved whether three lawsuits never discussed by the parties….were intended to be released by the settlement. The intent with which parties contract is an issue of fact.

We conclude appellants' arguments that the grounds found by the trial court cannot support the defense of mutual mistake as a matter of law have no merit.

*Id.* at 832, 834 (internal citations omitted).

*De Monet v. Pera* further bolsters guarantors' position. 877 S.W.2d 352 (Tex. App.—Dallas 1994). The trial court granted summary judgment for the buyer on mutual mistake, rescinding the contract for the purchase of a building. *Id.* at 355. The court of appeals reversed, finding fact issues. *Id.* at 359. The mistake involved the existence of asbestos in the building. *Id.* at 360. The Court explained:

…Seller contends that the trial court erred in not finding the absence of mutual mistake as a matter of law because [buyer] bore the risk of the alleged mistake…The representation and… provisions in the purchase agreement…do not allocate the risk of possible asbestos problem to [buyer]; therefore section 154(a) does not apply…[A] contract is ambiguous when…it remains unclear about which of two meanings is the intended one….A trial court cannot grant a summary judgment based upon an ambiguous writing.

*Id.* at 360. Application of this logic requires reversal of the trial court's judgment in the case at bar.

**III.**

**THE MARCH 15, 2010 CONSENT OF GUARANTORS REVIVED ANY OF APPELLANTS' CLAIMS RELEASED, MODIFIED, OR WAIVED IN EARLIER CONTRACTS.**

The Court holds that Guarantors waived and were not entitled to assert any affirmative defenses or counterclaims. (*See* App. A at 12, 27-30). The Court relies on the original loan documents from March 28, 2007 in its analysis. (*See* App. A at 19, 24-26; CR Vol. 1 at 213-65; Brief of Appellants at App. V). However, the court overlooks and does not address the March 15, 2010 Consent of Guarantors that revived any and all of Appellants' claims and defenses. (CR Vol. 1 at 269-70, and attached as Appendix B). The March 15, 2010 Consent of Guarantors provides, as follows:

> ***Lender acknowledges and agrees that: (i) the Guarantors have not released, modified, or waived, any claim or cause of action <u>that could possibly exist against the Lender</u>, and (ii) Guarantors have retained and reserve any claim that they may have had in the past, present, or future against Lender;*** and (iii) all statutes of limitations related to any cause of action which Guarantors may have with respect to the Note, Guaranty Agreement, or any agreements or liens related thereto, are hereby tolled. No applicable statute of limitations will commence to run until Guarantors have received written notice from Lender that the tolling agreement continued in item (iii) above is no longer in effect.
>
> (CR Vol. 1 at 269) (emphasis added).

This unambiguous language revives any claim Appellants previously "released, modified, or waived." However, this language was not analyzed, acknowledged,

14

addressed, or even mentioned in the Opinion. Any finding that Guarantors have released, modified, waived, or otherwise forfeited their claims or defenses in the original loan and guaranty agreements must be re-evaluated in light of this language. This language gives Appellants valuable rights and viable claims, and it cannot be ignored or reasoned away. Fundamental rules of contract construction require that this language be given meaning and effect, and doing so requires reversal of the trial court's judgment. *See El Paso Field Services v. Mastec N.A.,* 389 S.W.3d 802, 805 (Tex. 2012) (A contract should be construed so that all terms are given effect and none are rendered meaningless.).

**IV.**

**THE ECONOMIC LOSS RULE DOES NOT BAR GUARANTORS' CLAIMS FOR DAMAGES THAT WERE NOT THE SUBJECT OF ANY CONTRACT BETWEEN THE GUARANTORS AND THE BANK.**

Texas banks are subject to the same duties as anyone in the State of Texas when they undertake to do something. A contracting party may be liable for the negligent performance of an undertaking if it voluntarily undertakes to perform a service for the other party, recognizes the service as necessary for the protection of the other's person or things, and its negligence increased the risk of harm to the other or the other relied on the undertaking. *See Torrington Co. v. Stutzman*, 46 S.W.3d 829, 837-839 (Tex. 2000); *Colonial Sav. Ass'n v. Taylor*, 544 S.W.2d 116, 119-20 (Tex. 1976). This principle in Section 323 of the Restatement of Torts has

15

been applied in several cases where a party has gratuitously undertaken to provide insurance for another and negligently failed to do so. *See, e.g., English v. Fischer*, 660 S.W.2d 521, 524-25 (Tex. 1983) (Spears, J., concurring).

The First Preferred Ship Mortgage ("FPSM") states that "Owner shall do everything necessary to establish and maintain this Mortgage as a First Preferred Mortgage . . ." (CR Vol. 3 at 830, last sentence) Despite this, Appellee voluntarily undertook to prepare and file a lien on the vessel. (CR Vol. 1 at 30-33; Vol. 3 at 1125-34; Vol. 5 at 1761-64). As with any voluntary undertaking, Appellee had a duty to do so in a non-negligent manner. The Court is mistaken as to the duties set forth in the contract: this was an extra-contractual undertaking accompanied by a duty not set forth in any contract.

Banks have duties to their customers that sound in tort as well as contract. *City Bank v. Compass Bank*, 2010 U.S. Dist. LEXIS 66260 *5 (W.D. Tex. 2010), citing *Mission Petroleum Carriers, Inc. v. Solomon*, 106 S.W.3d 705, 710 (Tex. 2003). The Supreme Court of Texas has found a bank breached its duty to use reasonable care in providing information to its customers when it encouraged its customers to incur expenses in reliance on the information related to their loan application. *Federal Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991); see also RESTATEMENT (SECOND) OF TORTS §552B (1977).

16

The tort claims in that case were not barred by any inference that the borrower's claims sounded only in contract. *Sloane*, 825 S.W.2d at 442 (Tex. 1991).

In an over-broad application of the economic loss rule, the Opinion disallows damages well beyond the subject and terms of the parties' contracts. (*See* Brief of Appellants at 57). Rather, the Opinion simply holds that under the terms of the agreement, Appellee did not owe any duty to the Guarantors to secure the collateral or apply it against the Guarantors' obligations. (App. A at 30). However, this is not the basis for Appellants' counterclaims or damages. Appellee voluntarily undertook to handle the lien against the vessel, and it did so in an improper and negligent manner, causing damage to Appellants.

The Court mistakenly characterizes Appellants' counterclaims as alleging that Appellee was contractually required to collateralize the loan properly and its failure to do so as causing the Borrower to lose the collateral, thereby increasing the Guarantors financial liability under the Guaranty Agreements. (App. A at 29). The Court is mistaken as to the parties (the Borrower/Owner was BLyn II Holding, LLC, not Guarantors) and the duties (the duty to establish and maintain a first lien on the vessel lay with the Borrower, not the bank, but the bank voluntarily undertook to do and did it negligently) at issue. The Court's blurring of the parties and duties and broad application of the economic loss rule do not take into account the loss of the value of Appellants' investment in Borrower and the projected

17

income stream from the charter business. (*See* Brief of Appellants at 57 and App. App. A-D thereto [Credit Approval Forms]).

The economic loss rule does not swallow all claims that arise from independent duties. The focus of the inquiry is whether the injury is to the subject of the contract itself. *Equistar Chems., L.P. v. Dresser-Rand Co.*, 240 S.W.3d 864, 867 (Tex. 2007); *Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 12-13 (Tex. 2007); *Med. City Dallas, Ltd. v. Carlisle Corp.*, 251 S.W.3d 55, 61 (Tex. 2008); *½ Price Checks Cashed v. United Auto. Ins. Co.*, 344 S.W.3d 378, 387 (Tex. 2011).

As the Texas Supreme Court has recognized, "a party cannot avoid tort liability to the world simply by entering into a contract with one party [otherwise the] economic loss rule [would] swallow all claims between contractual and commercial strangers." *Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 419 (Tex. 2001). The law in Texas does not allow banks *carte blanche* to misrepresent the nature of a loan and bind borrowers and guarantors to a deficient set of loan documents. This Court's Opinion sends a message to Texas banks that they have no obligation to even attempt to properly document loans.

18

# V.

## APPELLEE MATERIALLY ALTERED THE TERMS OF THE LOAN, THEREBY RELEASING GUARANTORS FROM THEIR OBLIGATIONS UNDER THE GUARANTY AGREEMENT.

Texas courts strictly construe guaranties, and a guarantor may be discharged by the material alteration of a contract between the principal debtor and the creditor. *FDIC v. Attayi*, 745 S.W.2d 939, 944 (Tex. App.—Houston [1st Dist.] 1988, no writ) (citing *Old Colony Ins. Co. v. City of Quitman*, 352 S.W.2d 452, 455-56 (1961)). The release of a security interest in the collateral has been held to be an unjustifiable impairment unless the guarantors consent to such action. *Lawyers Title Ins. Corp. v. Northeast Texas Dev. Co.*, 635 S.W.2d 897, 899 (Tex. App.—Tyler 1982, writ ref'd n.r.e.) (citations omitted). Where material deviations from the underlying agreement were made without the guarantor's assent and such deviations were prejudicial, the Texas Supreme Court found an issue of material fact existed and summary judgment was improper. *Vastine v. Bank of Dallas*, 808 S.W.2d 463, 464 (Tex. 1991).

In this case, the Promissory Note represents that it is secured by the FPSM and the Vessel. (CR Vol. 5 at 1762-63). The FPSM expressly states that the Appellee was taking a first lien, had a first lien on the Vessel and that the Vessel was collateral for the Promissory Note and the loan. (*Id.*; CR Vol. 2 at 748; Vol. 5 at 1765-67, 1772, 1777). Appellee expressed to the Borrower and Appellants

19

verbally, in writing and through its actions that it would take action to secure a first lien on the Vessel, that it had a first lien on the Vessel, and that the Vessel was collateral for the loan. (CR Vol. 3 at 980, 1125-48; Vol. 4 at 1439-40; Vol. 5 at 1765-67, 1772, 1777). Because Appellee materially altered the terms of the deal by eliminating a key term, without Appellants' consent and to their detriment, the Guaranty Agreement between Appellee and Appellants is not enforceable. Moreover, the Court's determination that this argument was waived should be reviewed in light of the March 15, 2010 Consent of Guarantors reviving such defense.

## CONCLUSION

The Court has found that limitations began to run on Appellee's claims for breach of the Guaranty Agreements on a date that follows the filing of this suit for such breach by some eighteen months, and that is logically and legally incorrect. Texas law allows the rescission of a contract when the parties make a mutual mistake, but the Court has failed to recognize how the parties' mutual mistake regarding lien priority unfairly and impermissibly altered the allocation of risk between the parties. Additionally, by omitting any analysis of the claim saving language in the March 15, 2010 Consent of Guarantors, the Court does not address the complete contract between the parties and any judgment related to the incomplete contractual analysis must be reversed. The Opinion bases its

20

affirmation of the trial court's judgment on findings that give *carte blanche* to Texas banks to conduct careless lending practices and does not require that the banks do so with ordinary care. Furthermore, the damages sought by Appellants' counterclaims are not the subject of any contract with Appellee; therefore, Guarantors' claims cannot be barred by the economic loss rule. Appellee's mishandling of the lien against the vessel resulted in a material alteration of the parties' contracts and the business arrangement to which Appellants agreed, and this should excuse Appellants for any further liability. Lastly, the Court's ruling on contractual assumption of the risk of mistake significantly alters Texas' long standing remedy of mutual mistake.

## PRAYER

WHEREFORE, APPELLANTS Allen L. Berry, Joseph D. McCord, and Robert G. Taylor, II respectfully request that this Honorable Court grant this *Motion for Rehearing*, withdraw the Court's June 2, 2015 *Opinion*, reverse the trial court's February 24, 2014 *Final Judgment*, render judgment in favor of Appellants, remand this cause to the trial court as appropriate, and grant all such other and further relief to which Appellants may show themselves entitled.

Respectfully submitted,

**HENKE & WILLIAMS**


By:    /s/ *Jett Williams III*
       JETT WILLIAMS III
       State Bar No. 21554000
       JWilliams@HenkeLawFirm.com
       Kathleen H. Boll
       State Bar No. 00798431
       Charlie Henke
       State Bar No. 00784254
       3200 Southwest Freeway
       34th Floor
       Houston, Texas 77027
       Telephone: (713) 940-4500
       Facsimile: (713) 940-4545

       **ATTORNEYS FOR APPELLANT**
       **JOSEPH D. McCORD**

22

**LAW OFFICE OF ROBERT G. TAYLOR, III**

By: _/s/ Robert G. Taylor,III_
Robert G. Taylor, III
State Bar No. 19721100
4119 Montrose, Suite 400
Houston, Texas 77006
Telephone: (713) 654-7799
Facsimile: (713) 654-7814

**ATTORNEYS FOR DEFENDANT/APPELLANT ROBERT G. TAYLOR, II**

By: _/s/ Jerry S. Payne_
Jerry S. Payne
State Bar No. 15658000
616 Voss Rd.
Hunters Creek Village, Texas 77024
Telephone: (713) 785-0677
Facsimile (713) 781-8547

**ATTORNEYS FOR DEFENDANT/APPELLANT ALLEN L. BERRY**

23

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing *Appellants' Motion For Rehearing* has been sent to the following counsel of record on this the 1st day of July, 2015:

*Counsel for Plaintiff/Appellee*
Paul J. Dobrowski
Dobrowski, Larkin & Johnson L.L.P.
4601 Washington Avenue, Suite 300
Houston, Texas 77007
(713) 659-2900 / (713) 659-2908 (Fax)
*Via eFile and Facsimile*

*Counsel for Defendant/Appellant Robert G. Taylor, II*
Robert G. Taylor, III
Law Office of Robert G. Taylor, III
4119 Montrose, Suite 400
Houston, Texas 77006
(713) 654-7799 / (713) 654-7814 (Fax)
*Via eFile and Facsimile*

*Counsel for Defendant/Appellant Allen L. Berry*
James E. "Jeb" Brown, II Will Allen Shindler, Jr.
3100 Edloe Street, Suite220
Houston, Texas 77027
(713) 439-1988 / (832) 460-3263 (Fax)
*Via eFile and Facsimile*

*Counsel for Defendant/Appellant Allen L. Berry*
Jerry S. Payne
616 Voss Rd.
Hunters Creek Village, Texas 77056
(713) 785-0677 / (713) 781-8547 (Fax)
*Via eFile and Facsimile*

/s/ *Jett Williams III*
JETT WILLIAMS III

## CERTIFICATE OF COMPLIANCE

I hereby certify that this document was produced on a computer using Microsoft Word 2010 and contains 4,411 words, as determined by the software's word-count function, excluding the sections of the document listed in TEX. R. APP. P. 9.4(i)(3).

/s/ *Jett Williams III*
JETT WILLIAMS III



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-14-00246-CV

_____

**ALLEN L. BERRY, JOSEPH D. MCCORD, AND ROBERT G. TAYLOR, II,**
**Appellants**

**V.**

**ENCORE BANK, Appellee**

---

**On Appeal from the 152nd District Court**
**Harris County, Texas**
**Trial Court Case No. 2010-63264**

---

## MEMORANDUM OPINION

Allen Berry, Robert Taylor, and Joseph McCord guaranteed a loan from Encore Bank to BLyn II Holding, LLC, a Texas limited liability company ("Blyn") of which Berry, Taylor, and McCord were members. After Blyn defaulted on the loan, Encore sued the three guarantors, asserting causes of action for breach-of-

contract and suit on a guaranty. All parties filed motions for summary judgment. The district court granted Encore Bank's two motions and denied the guarantors' motion. The district court also denied the guarantors' challenge to Encore Bank's summary-judgment evidence.

In five issues, the guarantors contend that the trial court erred by (1) denying their motion for summary judgment asserting that Encore's claims are barred by limitations, (2) granting Encore summary judgment on the guarantors' defense of mutual mistake, (3) granting Encore summary judgment on the guarantors' negligence and negligent misrepresentation counterclaims, (4) granting Encore summary judgment on its breach-of-contract and suit-on-guaranty claims, and (5) overruling the guarantors' objections to Encore's summary judgment evidence.

We affirm.

## Background

This case arises from a default on a loan obtained to finance the refurbishment of a luxury yacht. The yacht was listed as collateral for the loan. Three of the businessmen affiliated with the borrower executed personal guarantees. The collateral was lost to another entity after the lender's interest in the collateral was primed[1] by a maritime lien placed on the yacht by the entity that

---

[1]    In the context of competing claims to collateral, the claim that takes the highest priority is said to "prime" the lesser claims. *See* BLACK'S LAW DICTIONARY 1311 (9th ed. 2009).

APPENDIX A

refurbished the yacht. The lender, Encore, then sought judgment against the three guarantors for the full amount of the loan, without any available offset due to the loss of the yacht as collateral. The district court granted Encore summary judgment and entered a final judgment against the guarantors.

## A.    The refurbishment project

Berry, McCord, and Taylor are personal friends who entered into a series of business transactions to purchase and renovate a luxury yacht named the *Betty Lyn II*. They planned to enter the yacht into the charter market "as a luxury, expedition style yacht." The friends formed Blyn and purchased the *Betty Lyn II* in December 2005.

Blyn selected Crimson Yachts and Horizon Shipbuilding, Inc., in Alabama, to refurbish the yacht. Contract negotiations began between Blyn and Crimson in May 2006. The yacht was delivered to Crimson's shipyard in June or July 2006. The refurbishment contract between Blyn and Crimson was signed on August 1, 2006, and Crimson began working on the project "on or before August 1, 2006."

## B.    Encore makes unsecured and secured loans

In August 2006, Encore made an unsecured loan to Blyn for $400,000 to pay Crimson's invoices. Encore made another unsecured loan of $600,000 two months later to meet Blyn's subsequent obligations to Crimson.

3

In October 2006 the Blyn members met with Crimson and Encore representatives to set a total budget for the project and discuss financing. The October 19 Encore Credit Approval Form notes that Crimson had already begun work on the yacht.

Blyn executed loan documents for a $6 million loan from Encore on March 28, 2007. Blyn also executed a First Preferred Ship Mortgage, a Promissory Note, and other "Loan Documents." The maturity date for the loan was listed as April 15, 2009.

## C.    The guaranty agreement

The terms of a guaranty agreement determine whether the lender is required to collect from the borrower or on the collateral before looking to the guarantor to satisfy the debt. *See, e.g.*, *Yamin v. Conn, L.P.*, No. 14-10-00597-CV, 2011 WL 4031218, at *6 (Tex. App.—Houston [14th Dist.] Sept. 13, 2011, no pet.) (mem. op.).

The three Blyn members—Berry, McCord, and Taylor—personally guaranteed the $6 million loan from Encore to Blyn to finance the yacht refurbishment. Under the terms of their guaranty contract, the three agreed to "unconditionally guarantee" the prompt payment "when due at maturity" of the principal amount of $6 million borrowed by Blyn, "including all principal, interest, charges, and attorneys' fees" which may become due. The guarantors waived

4

notice of loan renewals, modifications or rearrangements, as well as nonpayment, default, and demand. The guarantors agreed that, in case of default, the loan could be "accelerated, extended, modified, amended or renewed . . . [and that] any other indulgence may be granted with respect" to the loan by Encore.

The guaranty created an independent obligation on the part of the guarantors to pay the full amount of the note "at maturity." The guaranty left to Encore's discretion, in case of an earlier default, whether to accelerate the obligation. It further provides that the

> rights of Lender are cumulative and shall not be exhausted by its exercise of any of its rights hereunder or otherwise against Guarantor or by any number of successive actions until and unless all indebtedness constituting the Obligations have been paid, and other Obligations have been performed, including each of the obligations of Guarantor hereunder.

The guarantors "expressly waive[d] any right to the benefit of or to require or control application of any security or collateral or the proceeds" of that collateral and agreed that Encore had no duty, with respect to the guarantors, to apply security or collateral to the amount of the loan. The guaranty signed by all three guarantors states that it is "intended to be an absolute and unconditional guarantee of payment" and that the guarantors are not relying on any representations, written or oral, by Encore except those expressly included in the guaranty. Finally, the guarantors agreed that they were provided an opportunity to

5

obtain legal advice regarding the guaranty and that they fully understand its implications and ramifications.

## D.     Default and litigation

In March 2008—two years into the refurbishment—a dispute developed between Blyn and Crimson regarding the increased cost of and anticipated completion date for the project. In late March or early April 2008, Blyn stopped paying Crimson's invoices. On April 4, 2008, Crimson declared Blyn to be in default for failure to pay Crimson's invoices.

Despite being in default on its obligations to Crimson, Blyn continued to meet its payment obligations to Encore by making interest payments as they became due. Blyn executed a note modification agreement on the original maturity date—April 15, 2009—extending the maturity date on the loan to March 15, 2010. The parties entered into a second note modification agreement on March 15, 2010, that extended the maturity date again to March 15, 2012. That same day, the guarantors executed a consent of guarantors, agreeing to the extension of the loan maturity date.

Crimson filed an *in rem* action against the yacht in June 2008 in the United States District Court for the Southern District of Alabama. Crimson asserted that it obtained a maritime lien on the yacht as soon as it began refurbishing the vessel and, as a result of Blyn's failure to pay its invoices, that it had the legal right to

6

arrest the vessel and sell it to pay the lien. Following an appeal and remand, that court concluded that Crimson's maritime lien primed Encore's mortgage. *Crimson Yachts v. M/Y Betty Lyn II*, No. 08-0334-WS-C, 2010 WL 2104524, at \*1–2 (S.D. Ala. May 25, 2010). Crimson then sold the yacht for less than the amount due and applied those funds towards Blyn's debt, which left no collateral to satisfy Blyn's obligations to Encore or to offset the guarantors' individual liability.

Litigation between Crimson and Blyn continued. The suit was transferred from Alabama to federal court in Texas. In early 2013, after the United States District Court for the Southern District of Texas entered an order awarding damages to Crimson with an offset for poor custodial care of the yacht, Blyn appealed to the Fifth Circuit, but the appeal was later dismissed. *Horizon Shipbuilding Inc. v. BLyn II Holding LLC*, No. C-12-60, 2012 WL 2911918 (S.D. Tex. July 16, 2012), *appeal dism'd* Jan. 3, 2013.

In the interim, Encore began litigation against the guarantors. On September 10, 2010—which was approximately four months after the federal court ruled that Crimson's maritime lien primed Encore's interest in the yacht—Encore sued the guarantors. Although the loan-maturity date had not yet passed, Encore asserted that Blyn was in non-monetary default on its loan by failing to meets its contractual obligations to Crimson. The guarantors were not served. They continued to make all required interest payments on the Blyn loan. The loan

7

matured on March 15, 2012, at which point the full amount of the loan became due, but neither Blyn nor the guarantors paid the loan balance. The guarantors were served with suit shortly after the loan maturity date passed.

**The Parties' Competing Motions for Summary Judgment**

Encore filed two summary-judgment motions, asserting both no-evidence and traditional summary-judgment points.[2] In addition to seeking to recover on the guaranty, it also sought judgment on the guarantors' counterclaims and affirmative defenses.

The guarantors filed a single response to both of Encore's summary-judgment motions. The guarantors also filed objections to the affidavit of John Lingor, Encore's custodian of records, and other summary-judgment evidence. In addition to responding to Encore's two summary-judgment motions, the guarantors filed a cross-motion for summary judgment on their limitations affirmative defense.

The trial court granted Encore's two summary-judgment motions and denied the guarantors' summary-judgment motion. The trial court then entered a final judgment for Encore, awarding it $3.6 million for the outstanding principal balance on the note, as well as prejudgment interest, late fees, attorney's fees and post-judgment interest.

---

[2]     Through its traditional summary-judgment motion, Encore established its right to enforce the guaranty as a matter of law.

APPENDIX A

The guarantors appeal the orders denying their summary-judgment motion, granting Encore's two summary-judgment motions, and overruling in part their objections to summary-judgment evidence.

## A.     Standard of review

We review the district court's summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). "When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *Dorsett*, 164 S.W.3d at 661; *Knott*, 128 S.W.3d at 215; *accord Sci. Spectrum, Inc. v. Martinez*, 941 S.W.2d 910, 911 (Tex. 1997). Summary judgment is proper when there are no disputed issues of material fact and the movant is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *Knott*, 128 S.W.3d at 215–16. When, as here, both parties move for summary judgment and the district court grants one motion and denies the other, we review the summary-judgment evidence presented by both sides, determine all questions presented, and render the judgment the district court should have rendered. *Tex. Workers' Comp. Comm'n v. Patient Advocates of Tex.*, 136 S.W.3d 643, 648 (Tex. 2004); *FM Props. Operating Co. v. City of Austin*, 22 S.W.3d 868, 872 (Tex. 2000).

9

## B.    Statute of limitations defense

Encore sued to collect on the personal guaranty executed by the three Blyn members. The trial court granted Encore summary judgment, holding that the guarantors' defenses and counterclaims were unavailing. Before reaching the merits of the competing claims or construing the loan documents, we address the guarantors' first issue: whether the trial court erred in denying their statute of limitations defense.

Generally, breach-of-contract claims must be brought within four years. TEX. CIV. PRAC. & REM. CODE ANN. § 16.004(a)(3) (West 2002). When a claim accrues is a question of law reviewed de novo. *See Moreno v. Sterling Drug*, 787 S.W.2d 348, 351 (Tex. 1990). "A claim generally accrues when facts come into existence that authorize a claimant to seek a judicial remedy." *Sowell v. Int'l Interests, LP*, 416 S.W.3d 593, 598 (Tex. App.—Houston [14th Dist.] 2013, pet. denied).

The guarantors contend that Encore's claim accrued against them either on the closing date for the loan or one year later, on March 26, 2008, when Blyn stopped paying Crimson's invoices. The guarantors argue that, based on that date, the four-year statute of limitations expired no later than March 26, 2012, and, because they had not been served process by that date, the statute of limitations ran on Encore's claims against them.

10

In response to the guarantors' summary-judgment motion, Encore argued that all interest payments required under the terms of Blyn's note were paid timely until the March 15, 2012 maturity date, at which point, neither Blyn nor the guarantors paid off the obligations. Encore pointed to its August 2012 second amended petition in which it asserted that the parties' note modification agreement extended the loan-maturity date to March 15, 2012. It attached to the amended petition the two note modification agreements, extending the maturity date first to March 15, 2010, and then to March 15, 2012, as well as a consent of guarantors, signed by all three guarantors on March 15, 2010, acknowledging and consenting to the loan modification. Encore argued that its breach-of-contract and suit on guaranty claims did not accrue until the guarantors failed to pay off the loan on the maturity date—March 15, 2012.

We look first to the parties' contracts to determine their rights and obligations. When construing a guaranty agreement, our primary goal is to ascertain and give effect to the parties' intent. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983); *Hasty v. Keller HCP Partners, L.P.*, 260 S.W.3d 666, 670 (Tex. App.—Dallas 2008, no pet.). The best guide to the parties' intent is the language of the guaranty, and where the language is clear and unambiguous, we may not look outside of that document to give it a different construction. *See Univ. Sav. Ass'n v. Miller*, 786 S.W.2d 461, 462–63 (Tex. App.—Houston [14th Dist.] 1990, writ

11

denied); *Sw. Sav. Ass'n v. Dunagan*, 392 S.W.2d 761, 767 (Tex. App.—Dallas 1965, writ ref'd n.r.e.).

The guaranty states that each guarantor "irrevocably, absolutely, and unconditionally guarantees to Lender the prompt payment when due at maturity of the [note]" and all other amounts due. Paragraph three of the guaranty allows Encore to seek payment from the guarantors without any requirement that it first sue Blyn:

> Guarantor shall be liable as a primary obligor for the payment and performance of the Obligations. Guarantor specifically agrees that, except as otherwise provided in the Loan Documents, it shall not be necessary or required, in order to enforce Guarantor's obligations under this Guaranty, that Lender have made demand for payment upon Borrower or any other person or entity liable thereon or have made protest thereof or have given notice to Borrower or any other party liable thereon of maturity or nonpayment of the Obligations.

Thus, to the extent the statute of limitations ran against the underlying borrower— between the date Blyn defaulted and the date Encore served the guarantors with suit on the guaranty—that defense is unavailable to the guarantors. *See Yamin*, 2011 WL 4031218, at *6 ("Whenever a creditor is permitted to sue a guarantor without first suing the principal, the guarantor cannot defend an action to recover on a promise to pay by showing that the claim against the principal is barred by the statute of limitations."); *Wiman v. Tomaszewicz*, 877 S.W.2d 1, 5 (Tex. App.— Dallas 1994, no writ) (same).

12

The guaranty created an independent obligation on the guarantors to pay the full amount of the note "at maturity," here, March 15, 2012. Paragraph 13 of the guaranty left to Encore's discretion, in case of default, whether to accelerate the obligation. Paragraph 19 further provides that the "rights of Lender are cumulative and shall not be exhausted by its exercise of any of its rights hereunder or otherwise against Guarantor or by any number of successive actions until and unless all indebtedness constituting the Obligations have been paid, and other Obligations have been performed, including each of the obligations of Guarantor hereunder."

We reject the guarantors' contention that the statute of limitations ran on Encore's claims against the guarantors, given that the guarantors renewed their obligations under that contract within the two preceding years. TEX. CIV. PRAC. & REM. CODE ANN. § 16.004(a)(3) (establishing a four-year statute of limitations). We conclude that the trial court did not err in denying the guarantors' summary-judgment motion on the defense of limitations.

Accordingly, we overrule the guarantors' first issue.

## C.    Mutual mistake defense

In their second issue, the guarantors argue that the guaranty is voidable due to a mutual mistake of fact. They contend the parties mistakenly believed that Encore had a primary lien on the vessel and did not realize that Crimson already

13

had a preferred, maritime lien on the vessel when the guaranty contract was executed. It is this superior lien position that allowed Crimson to take possession of and sell the yacht, denying Blyn and the guarantors the benefit of the collateral to offset their obligations to Encore.

We consider first the manner in which a maritime lien comes into existence and the extent to which the parties may have been mistaken about Crimson's lien.

## 1. Maritime liens

A maritime lien is "a unique security device, serving the dual purpose of keeping ships moving in commerce while not allowing them to escape their debts by sailing away." *Equilease Corp. v. M/V Sampson*, 793 F.2d 598, 602 (5th Cir. 1986); *see Governor & Co. of Bank of Scot. v. Sabay*, 211 F.3d 261, 267 (5th Cir. 2000).

"The maritime lien developed as a necessary incident of the operation of vessels." *Piedmont & George's Creek Coal Co. v. Seaboard Fisheries Co.*, 254 U.S. 1, 9, 41 S. Ct. 1, 3 (1920); *see Effjohn Int'l Cruise Holdings, Inc. v. A&L Sales, Inc.*, 346 F.3d 552, 556 (5th Cir. 2003). "The purpose of maritime liens is 'to enable a vessel to obtain supplies or repairs necessary to her continued operation by giving a temporary underlying pledge of the vessel which will hold until payment can be made or more formal security given.'" *Lake Charles Stevedores, Inc. v. Professor Vladimir Popov MV*, 199 F.3d 220, 223 (5th Cir.

14

1999) (quoting *The Everosa*, 93 F.2d 732, 735 (1st Cir. 1937)); *see Piedmont & George's Creek Coal Co.*, 254 U.S. at 9, 41 S. Ct. at 3 ("Since she is usually absent from the home port, remote from the residence of her owners and without any large amount of money, it is essential that she should be self-reliant—that she should be able to obtain upon her own account needed repairs and supplies."); *Veverica v. Drill Barge Buccaneer No. 7*, 488 F.2d 880, 883 (5th Cir. 1974) ("The very purpose of maritime liens is to encourage necessary services to ships whose owners are unable to make contemporaneous payment.").

"The lien arises when the debt arises, and grants the creditor the right to appropriate the vessel, have it sold, and be repaid the debt from the proceeds." *Equilease Corp.*, 793 F.2d at 602. Thus a maritime lien is "a property right that adheres to the vessel wherever it may go. Such a lien has been held to follow the vessel even after it is sold to an innocent purchaser." *Id.*; *see Sabay*, 211 F.3d at 267–68 (quoting *Equilease Corp.*, 793 F.2d at 602). A maritime lien gives the lien-holder the ability to recover against the value of the vessel in an *in rem* action. *See Effjohn Int'l Cruise Holdings*, 346 F.3d at 556. "Maritime liens have priority over non-maritime liens and priority over other maritime liens in reverse chronological order . . . ." *Crimson Yachts v. Betty Lyn II Motor Yacht*, 603 F.3d 864, 870 (11th Cir. 2010) (in related litigation involving same yacht, holding that yacht meets

15

definition of "vessel" to subject it to admiralty jurisdiction and allow Crimson to benefit from maritime lien).

Federal courts that have addressed the issue concur that maritime liens do not need to be recorded to be enforced. *See, e.g.*, *P.R. Ports Auth. v. BARGE KATY–B*, 427 F.3d 93, 104 (1st Cir. 2005); *Luis A. Ayala-Colon Sucres., Inc. v. Break Bulk Servs., LLC*, 925 F. Supp. 2d 199, 204 (D. P.R. 2013) (citing *Vandewater v. Mills, Claimant of Yankee Blade*, 60 U.S. 82, 89 (1856)); *L & L Elecs., Inc. v. M/V Osprey*, 764 F. Supp. 2d 270, 274 (D. Mass. 2011). They, therefore, have been described as "silent" and "secret." *See, e.g.*, *Sembawang Shipyard, Ltd. v. Charger, Inc.*, 955 F.2d 983, 988 (5th Cir. 1992); *Merchs. & Marine Bank v. The T. E. Welles*, 289 F.2d 188, 194 (5th Cir. 1961); *P.R. Ports Auth.*, 427 F.3d at 104; *L & L Elecs.*, 764 F. Supp. 2d at 274.

### 2.  All parties were aware repairs began before loan was executed

All parties were aware that the Betty Lyn was already in Crimson's Alabama shipyard undergoing repairs as part of a large-scale refurbishment before (1) Blyn executed the loan documents giving Encore a security interest in the yacht and (2) the Blyn members executed the personal guarantees. There was no mistake of fact concerning the chronology of the repairs and the loan.

16

Crimson began repairing the *Betty Lyn II* by August 1, 2006. Crimson held a maritime lien on the vessel[3] as of that date and had the legal right to bring an *in rem* action to enforce its lien, if necessary, from that date forward. *See Equilease Corp.*, 793 F.2d at 602; *Effjohn Int'l Cruise Holdings*, 346 F.3d at 556. The Blyn members' interest in the yacht was subject to the maritime lien before Blyn sought to grant a security interest in the yacht to its lender, Encore.

### 3.    The guarantors contractually assumed risk of a mistake of fact

The guarantors contend that neither they nor Encore realized that Crimson obtained a maritime lien on the yacht it was repairing as soon as the repairs began. According to the guarantors' expert, the parties "all mistakenly believed the Bank's FPSM was a first priority preferred ship mortgage entitled to the preferred status granted by the Ship Mortgage Act and not subject to any preferred maritime liens, including any shipyard maritime liens . . . ." He asserts that "[a]n ordinary bank using ordinary prudence in the same or similar circumstances would have obtained a subordination agreement from the shipyard before the loan was funded." One of the three guarantors, McCord, confirms in his affidavit that he "relied on Encore to seek consultation from counsel on maritime issues" and

---

[3]    During earlier litigation concerning the *Betty Lyn II*, a federal district court held that the yacht was a "vessel" during the repair period, thus allowing Crimson to obtain a maritime lien for its repair work. *Crimson Yachts v. M/Y Betty Lyn II*, No. 08-0334-WS-C, 2010 WL 2104524, at *1–2 (S.D. Ala. May 25, 2010) (recognizing Crimson's maritime lien and declaring that lien was first-in-time with priority over Encore's rights).

17

asserts that "Encore and its lawyers knew or should have known that Crimson had a maritime lien on the Vessel before the Loan Documents, including the FPSM, were executed."

The guarantors argue that there was a mutual mistake of fact regarding the shipyard's existing maritime lien. Neither side realized the maritime lien existed. As such, the guarantors contend that their contractual obligations under the personal guarantees are voidable.

While we agree that a mutual mistake of fact can provide a basis for avoiding a contractual obligation, *see N.Y. Party Shuttle, LLC v. Bilello*, 414 S.W.3d 206, 212 (Tex. App.—Houston [1st Dist.] 2013, pet. denied), that right can be overridden by the parties' agreement: "A person who intentionally assumes the risk of unknown facts cannot escape a bargain by alleging mistake or misunderstanding." *Geodyne Energy Income Prod. P'ship I-E v. Newton Corp.*, 161 S.W.3d 482, 491 (Tex. 2005); *accord Williams v. Glash*, 789 S.W.2d 261, 264 (Tex. 1990). In *Geodyne*, the Texas Supreme Court rejected the assertion of mutual mistake in light of section 154 of the Restatement, which provides that a party bears the risk of a mistake when

> (a) the risk is allocated to him by agreement of the parties, or

> (b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient . . . .

18

*See Geodyne*, 161 S.W.3d at 491 (citing RESTATEMENT (SECOND) OF CONTRACTS § 154 (1981)). "Just as a party may agree to perform in spite of impracticability or frustration that would otherwise justify his non-performance, he may also agree, by appropriate language or other manifestations, to perform in spite of mistake that would otherwise justify his avoidance." RESTATEMENT (SECOND) OF CONTRACTS § 154, cmt. b; *see Geodyne*, 161 S.W.3d at 491.

Here, the guarantors assumed the risk that Encore's acts or omissions would leave the parties without collateral to offset their obligations. Paragraph five of the guaranty agreement provides as follows:

> Guarantor specifically agrees that . . . Guarantor shall not be entitled to require, that Lender . . . make any effort at collection of the Obligations from Borrower, or foreclose against or seek to realize upon any security or collateral now or hereafter existing for the Obligations, or . . . exercise or assert any other right or remedy to which Lender is or may be entitled in connection with the Obligations or such security or collateral . . . . Guarantor specifically agrees that Guarantor shall not have any recourse or action against Lender by reason of any action Lender may take or omit to take in connection with the Obligations, the collection of any sums or amounts herein mentioned, or in connection with any security or collateral or any other guaranty at any time existing therefor.

Again, in paragraph 7, the guarantors "absolutely and unconditionally" agreed that

> if all or any part of the Obligations (or any instrument or agreement made or executed in connection therewith) is for any reason found to be invalid, illegal, unenforceable, uncollectible or legally impossible, for any reason whatsoever . . . then in any such case Guarantor shall pay and perform the Obligations as herein provided and that no such

19

occurrence shall in any way diminish or otherwise affect Guarantor's obligation hereunder.

We conclude that the guarantors contractually assumed the risk of a mistake that would leave the parties without access to the collateral. *See Geodyne*, 161 S.W.3d at 491. Accordingly, they may not avoid their contractual obligations by asserting a mutual-mistake defense. We overrule the guarantors' second issue.

## D.  Material alteration of contract as defense

In their third issue, the guarantors argue that Encore's failure to obtain a security right superior to Crimson's materially altered the terms of their agreement, discharging them of their obligations under the guaranty.

We determine the rights of the guarantors from the contract's terms. *United States v. Little Joe Trawlers, Inc.*, 776 F.2d 1249, 1254 (5th Cir. 1985); *Hopkins v. First Nat'l Bank at Brownsville*, 551 S.W.2d 343, 345 (Tex. 1977); *McKnight v. Va. Mirror Co., Inc.*, 463 S.W.2d at 430. A guaranty agreement may not be extended beyond its precise terms by construction or implication. *Reece v. First State Bank*, 566 S.W.2d 296, 297 (Tex. 1978); *FDIC v. Attayi*, 745 S.W.2d 939, 943 (Tex. App.—Houston [1st Dist.] 1988, no writ). Because courts strictly construe guarantees, a guarantor may be discharged by the material alteration of a contract between the principal debtor and the creditor. *Vastine v. Bank of Dallas*, 808 S.W.2d 463, 464 (Tex. 1991); *Old Colony Ins. Co. v. City of Quitman*, 352 S.W.2d 452, 455 (Tex. 1961); *Attayi*, 745 S.W.2d at 944.

20

A material alteration of a contract is one that either injures or enhances the guarantor's risk of injury. *United Concrete Pipe Corp. v. Spin–Line Co., Inc.*, 430 S.W.2d 360, 365–66 (Tex. 1968); *Attayi*, 745 S.W.2d at 944. Material alteration is an affirmative defense. *Attayi*, 745 S.W.2d at 944; *Bullock v. Kehoe*, 678 S.W.2d 558, 559 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.). To prevail on the defense, the guarantor must establish 1) a material alteration of the underlying contract; 2) made without his consent; 3) which is to his detriment, meaning it is prejudicial to his interest. *Vastine*, 808 S.W.2d at 464–65; *Attayi*, 745 S.W.2d at 944.

Under the terms of the guaranty, the guarantors agreed to be "liable as a primary obligor for the payment and performance of the Obligation." They further agreed that they "shall not have any recourse or action against Lender by reason of any action Lender may take or omit to take . . . in connection with any security or collateral." Moreover, they "absolutely and unconditionally" agreed that, "if all or any part of . . . any instrument or agreement made or executed in connection [with the loan] is for any reason found to be . . . unenforceable, uncollectible or legally impossible, for any reason whatsoever . . . then in any such case Guarantor shall pay and perform the Obligations as herein provided and that no such occurrence shall in any way diminish or otherwise affect Guarantor's obligation hereunder."

We hold that Encore was entitled to summary judgment on the guarantors' material-alteration affirmative defense. The loss of collateral cannot be viewed as a detriment to the guarantors to satisfy the third element of their material-alteration defense because, under the terms of the guaranty, Encore was not obligated to take action on the collateral before asserting a claim against the guarantors to satisfy the debt. Accordingly, we overrule the guarantors' third issue.

## E.     Counterclaims and other defenses

In their fourth issue, the guarantors generally assert that fact issues exist to prevent summary judgment for Encore on their many defenses. In their brief, they limit their argument to two of their counterclaims, that Encore: (1) negligently misrepresented loan information to them and (2) negligently failed to secure a superior lien. Any argument that summary judgment was improper as to their other pleaded defenses is waived. TEX. R. APP. P. 38.1(i).

### 1.     Negligent misrepresentation

Texas follows section 552 of the Restatement (Second) of Torts on information negligently supplied for the guidance of others, which reads:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

22

RESTATEMENT (SECOND) OF TORTS § 552 (1977); *see Fed. Land Bank Ass'n of Tyler v. Sloane*, 825 S.W.2d 439, 442 (Tex. 1991) (applying Restatement). Thus, the elements of a cause of action for negligent misrepresentation are:

(1)     the representation is made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest;

(2)     the defendant supplies 'false information' for the guidance of others in their business;

(3)     the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and

(4)     the plaintiff suffers pecuniary loss by justifiably relying on the representation.

*Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 686 n.24 (Tex. 2002); *Sloane*, 825 S.W.2d at 442.

A party to a transaction may contractually agree to waive reliance on another party's statements. *Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am.*, 341 S.W.3d 323, 332 (Tex. 2011); *Coastal Bank SSB v. Chase Bank of Tex., N.A.*, 135 S.W.3d 840, 843 (Tex. App.—Houston [1st Dist.] 2004, no pet.). "A contract and the circumstances surrounding its formation determine whether the disclaimer of reliance is binding." *Schlumberger Tech. Corp. v. Swanson*, 959 S.W.2d 171, 179 (Tex. 1997); *Coastal Bank*, 135 S.W.3d at 843. To be enforceable, a contractual disclaimer of reliance must contain language that is clear and unequivocal. *Italian Cowboy Partners*, 341 S.W.3d at 331, 333, 334, 336;

23

*Swanson*, 959 S.W.2d at 179–81. This is a threshold requirement; if it is not satisfied, the disclaimer is invalid. *Italian Cowboy Partners*, 341 S.W.3d at 331–36 & n.8; *Allen v. Devon Energy Holdings, L.L.C.*, 367 S.W.3d 355, 377 (Tex. App.— Houston [1st Dist.] 2012, pet. granted, judgm't vacated w.r.m.[4]). If the clarity requirement is satisfied, four extrinsic factors are considered: whether (1) the terms of the contract were negotiated or boilerplate, (2) the complaining party was represented by counsel, (3) the parties dealt with each other at arms' length, and (4) the parties were knowledgeable in business matters. *Forest Oil Corp. v. McAllen*, 268 S.W.3d 51, 60 (Tex. 2008); *see also Tex. Standard Oil & Gas, L.P. v. Frankel Offshore Energy, Inc.*, 394 S.W.3d 753, 763 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *Devon Energy Holdings*, 367 S.W.3d at 383.

Regarding the clarity requirement, the guaranty agreement clearly states that the guarantors are not relying on representations by the bank regarding the collateral:

> Guarantor is . . . familiar with the value of any and all collateral intended to be created as security for the payment of the Obligations; however, Guarantor is not relying on . . . the collateral as an inducement to enter into this Guaranty. . . . Guarantor acknowledges and agrees that neither Lender, nor any other party has made any representation, warranty or statement to Guarantor in order to induce Guarantor to execute this Guaranty.

---

[4] *See* TEX. R. APP. P. 56.3 (noting that intermediate appellate opinions retain precedential value even if case is dismissed as result of settlement following filing of petition for discretionary review, unless order of Texas Supreme Court specifically provides otherwise).

APPENDIX A

The guaranty further provides:

> Guarantor acknowledges and agrees that this Guaranty accurately represents and contains the entire agreement between Guarantor and Lender with respect to the subject matter hereof, that Guarantor is not relying, in the execution of this Guaranty, on any representations (whether written or oral) made by or on behalf of Lender except as expressly set forth in this Guaranty, and that any and all prior statements and/or representations made by or on behalf of Lender to Guarantor (whether written or oral) in connection with the subject matter hereof are merged herein.

Thus, the terms of the guaranty clearly and unequivocally state that the guarantors waive reliance.

The first extrinsic factor is whether the terms of the guaranty were negotiated. There is no indication in the record that they were. This factor weighs in favor of the guarantors.

The next factor asks whether the guarantors were represented by counsel. At least one of the three guarantors is a licensed attorney. That experience would have informed him of the benefits that counsel can provide to a party contemplating a large transaction. Relatedly, the size of this transaction and the amount of the guarantees that were executed would suggest that each of these guarantors was in a financial position to retain counsel, had each chosen to seek legal advice. Further, the guarantors confirmed in the guaranty that they had the ability to seek legal advice:

> Guarantor acknowledges that Guarantor has been afforded the opportunity to receive the advice of legal counsel of its own choice in

25

connection with the preparation and negotiation of this Guaranty, and Guarantor fully understands the implications and ramifications of the agreements herein made by Guarantor.

Given that one of the three was an attorney and they knowingly elected not to retain additional, outside counsel, this factor favors a determination that reliance was waived.

Next we consider whether this contract resulted from an arms' length transaction. Each of the guarantors was an experienced businessperson or lawyer. This was a $6 million transaction with an established bank. All aspects of this transaction were consistent with an arms' length relationship. This factor weighs in favor of enforcement.

The final factor is whether the guarantors were knowledgeable in business matters. As noted in a related federal-court opinion, the guarantors were experienced, successful businessmen, though without experience in this type of endeavor:

> The vessel's owner, BLyn, is comprised of . . . businessmen . . . . But none of the businessmen had any experience with refitting a vessel, much less refitting one that was old and in disrepair, with the end goal of producing a luxurious yacht. They did not understand the scope of the project and started down the refit road without a clear idea of their destination. It seems that there are quite a few optional details in yacht-building—expensive details. Despite their success in other endeavors, the BLyn members did not know how to manage this project.

*Horizon Shipbuilding*, 2012 WL 2911918, at *1.

Even without experience in maritime matters or yacht refurbishments in particular, these were experienced businessmen who were entering into an arm's length transaction involving a significant loan and personal guaranty. "A party to an arm's length transaction must exercise ordinary care and reasonable diligence for the protection of his own interests, and a failure to do so is not excused by mere confidence in the honesty and integrity of the other party." *Coastal Bank*, 135 S.W.3d at 843; *see Thigpen v. Locke*, 363 S.W.2d 247, 251 (Tex. 1962). Under these circumstances, it would have been unreasonable for the guarantors to have relied on the lender to educate them on the maritime-lien priority system or to protect their rights to the collateral over the rights of third parties. *See Swanson*, 959 S.W.2d at 180–81 (noting that, in context of tort claim based on assertion of fraudulent non-disclosure of pertinent information, there is no duty to disclose absent evidence of partnership or confidential relationship). This factor favors enforcement.

Three of the four *Forest Oil* extrinsic factors favor enforcement. Thus, we conclude that the guarantors contractually disclaimed reliance on any extrinsic statements made by Encore regarding lien priority or the possibility of offsetting Blyn's or the guarantors' obligations with the collateral. Accordingly, the trial court did not err in granting summary judgment to Encore on this issue.

27

## 2.    Negligence

The guarantors contend that Encore was negligent in its handling of the Blyn loan and collateral: "Encore's negligent failure to obtain a subordination agreement, perfected UCC liens and a first mortgage on the Vessel increased the risk of harm to the [guarantors]. The [guarantors] relied on Encore . . . and Encore's failure to act with ordinary care . . . has caused financial harm to [them]." Encore moved for summary judgment on the counterclaim—characterizing it as a breach-of-contract claim repackaged into a tort claim—and argued that the economic loss rule applied. According to Encore, the guarantors neither established that Encore owed them a duty nor provided any evidence of the remaining negligence elements. The trial court granted summary judgment in the bank's favor on the guarantors' negligence counterclaim.

We conclude that, for two reasons, the trial court did not err in granting summary judgment to Encore on this issue. First, any damages that might have resulted from Encore's failure to collateralize the loan properly were economic losses arising from the contract. The economic loss rule generally precludes recovery in tort for economic losses resulting from a party failing to perform under a contract. *Lamar Homes, Inc. v. Mid–Continent Cas. Co.*, 242 S.W.3d 1, 12 (Tex. 2007); *Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 495 (Tex. 1991); *Acad. of Skills & Knowledge, Inc. v. Charter Schs., USA, Inc.*, 260 S.W.3d 529, 541 (Tex.

28

App.—Tyler 2008, pet. denied). "The focus of the rule 'is on determining whether the injury is to the subject of the contract itself.'" *Acad. of Skills & Knowledge*, 260 S.W.3d at 541 (quoting *Lamar Homes*, 242 S.W.3d at 12). This is because, "[w]hen the injury is only the economic loss to the subject of a contract itself, the action sounds in contract alone." *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986). The economic loss rule restricts contracting parties to contractual remedies for their economic losses, even when the breach might reasonably be viewed as a consequence of the contracting party's negligence. *Lamar Homes*, 242 S.W.3d at 12–13. "If the action depends entirely on pleading and proving the contract in order to establish a duty, the action remains one for breach of contract only, regardless of how it is framed by the pleadings." *OXY USA, Inc. v. Cook*, 127 S.W.3d 16, 20 (Tex. App.—Tyler 2003, pet. denied).

For a contracting party to be held liable under a tort theory, the liability must arise independently of the existence of a contract between the parties; the defendant must breach a duty imposed by law rather than by the contract. *See DeLanney*, 809 S.W.2d at 494. Here, the guarantors allege that their business dealings with Encore required the bank to collateralize the loan properly and its failure to do so caused the guarantors to lose the collateral, thereby increasing their financial liability under the guaranty. This is a breach-of-contract claim seeking to recover economic losses.

29

Second, the guaranty agreement specifically stated that Encore would not be liable to the guarantors for failing to secure or apply the collateral against the guarantors' obligation: "Guarantor specifically agrees that . . . Guarantor shall not be entitled to require, that Lender . . . make any effort . . . to realize upon any security or . . . exercise or assert any other right or remedy to which Lender is or may be entitled in connection with . . . such security or collateral . . . ." Further, "Guarantor specifically agrees that Guarantor shall not have any recourse or action against Lender by reason of any action Lender may take or omit to take in connection with . . . any security or collateral or any other guaranty at any time existing therefor." The guarantors also "absolutely and unconditionally" agreed that if any part of the agreement "is for any reason found to be invalid, . . . uncollectible or legally impossible, for any reason whatsoever . . . that no such occurrence shall in any way diminish or otherwise affect Guarantor's obligation hereunder." Thus, under the terms of the agreement, Encore did not owe any duty to the guarantors to secure the collateral or apply it against the guarantors' obligations.

We overrule the guarantors' fourth issue.

## F. Taylor's Duress Defense

One of the guarantors, Taylor, separately contends that Encore took a "sign it or else" position with him when it presented him with the original loan

30

documents and required him to sign them immediately without permitting him time to have counsel review them. Taylor argues that a fact issue exists related to his duress defense, which prevents summary judgment in Encore's favor.

This claim fails as a matter of law because a defense of duress is not available unless evidence supports the conclusion that the party against whom the defense is asserted is the same party that created the duress: "Economic duress must be based on the acts or conduct of the opposite party and not merely on the necessities of the purported victim, or on his fear of what a third person might do." *Brown v. Cain Chem., Inc.*, 837 S.W.2d 239, 244 (Tex. App.—Houston [1st Dist.] 1992, writ denied); *see First Tex. Sav. Ass'n of Dall. v. Dicker Ctr., Inc.*, 631 S.W.2d 179, 185–86 (Tex. App.—Tyler 1982, no writ) ("[E]conomic duress may be claimed only when the party against whom it is claimed was responsible for claimant's financial distress.").

"[T]he mere fact that a person enters into a contract with reluctance, or as a result of the pressure of business circumstances, financial embarrassment, or economic necessity, does not, of itself, constitute business compulsion or economic duress invalidating the contract." *Dicker Ctr.*, 631 S.W.2d at 186. "Stress of business conditions will not constitute duress unless the defendant was responsible for that condition." *Id.*

31

Taylor claims that Encore pressured him into signing the original loan documents quickly and that he feared Blyn would default on its obligations to Crimson if the loan was not approved. There is no evidence that Encore was responsible for the economic pressure Taylor felt when he signed the loan documents. Choosing to begin a large-scale refurbishment project before funding had been secured was Blyn's decision; there is no evidence of coercion or duress by Encore to pursue these activities or to do so in this order.

Moreover, a party may ratify a contract that he previously had a right to repudiate. *Thomson Oil Royalty, LLC v. Graham*, 351 S.W.3d 162, 165–66 (Tex. App.—Tyler 2011, no pet.); *see Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 676–77 (Tex. 2000); *see also Sawyer v. Pierce*, 580 S.W.2d 117, 122 (Tex. App.—Corpus Christi 1979, writ ref'd n.r.e.). "Ratification occurs when one, induced by fraud to enter into a contract, continues to accept benefits under the contract after he becomes aware of the fraud, or if he conducts himself in such a manner as to recognize the contract as binding." *Sawyer*, 580 S.W.2d at 122; *see Cordero v. Tenet Healthcare Corp.*, 226 S.W.3d 747, 751–52 (Tex. App.—Dallas 2007, pet. denied); *Dicker Ctr.*, 631 S.W.2d at 186. When a defrauded party ratifies a contract, it "waives any right to seek rescission." *Sawyer*, 580 S.W.2d at 122; *Dicker Ctr.*, 631 S.W.2d at 186.

After he executed the loan documents in 2008, Taylor twice renewed his obligations under the guaranty by extending the maturity date on the loan and contractually binding himself to additional interest payments and, ultimately, the full amount of principal due. "When a note is made in renewal of a prior obligation known by the maker to be fraudulent or without consideration, the renewal note constitutes a waiver of the defense." *Roquemore v. Nat'l Commerce Bank*, 837 S.W.2d 212, 214–15 (Tex. App.—Texarkana 1992, no writ) (citing *City of Houston v. Lyons Realty, Ltd.*, 710 S.W.2d 625, 629 (Tex. App.—Houston [1st Dist.] 1986, no writ)); *see Cordero*, 226 S.W.3d at 751–52 (affirming summary judgment for corporation because employee ratified agreement after learning of alleged fraud). Thus, Taylor may not rely on a duress defense to avoid his obligations under the guaranty agreement.

We overrule the issue raised in Taylor's supplemental brief.

**Objection to Encore's Summary-Judgment Evidence**

In their fifth and final issue, the guarantors contend that the trial court erred by overruling various objections to Encore's summary-judgment evidence. In particular, they argue that the affidavit of John Lingor contained conflicting and conclusory statements.

Evidentiary rulings are committed to the trial court's sound discretion. *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753 (Tex. 1995); *Simien v. Unifund*

APPENDIX A

*CCR Partners*, 321 S.W.3d 235, 239 (Tex. App.—Houston [1st Dist.] 2010, no pet.). A trial court abuses its discretion when it rules "without regard for any guiding rules or principles." *Alvarado*, 897 S.W.2d at 754. An appellate court must uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling. *See State Bar of Tex. v. Evans*, 774 S.W.2d 656, 658 n.5 (Tex. 1989). Moreover, an erroneous evidentiary ruling will not be reversed unless the error probably caused the rendition of an improper judgment. *See* TEX. R. APP. P. 44.1(a); *Owens-Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998).

The guarantors contend that Lingor's affidavit conflicts with his deposition testimony and his various other affidavits, thus creating a fact issue. If summary-judgment evidence demonstrates that a genuine issue of material fact exists, summary judgment should be denied. *See* TEX. R. CIV. P. 166a(c). But the conflicts identified in Lingor's affidavit are immaterial. The guarantors complain that Lingor failed to identify the FPSM as a "loan document." While that is true, Encore conceded in its petition that the FPSM was a loan document, and it never argued to the contrary.

Additionally, the guarantors complain that Lingor alternatively describes the guarantee as "primary security" or "additional security" but offers no explanation why this semantic distinction constitutes a material fact issue. Therefore, any

34

conflict in Lingor's affidavit does not demonstrate a genuine issue of material fact. *See id.*

The guarantors further complain that Lingor's affidavit contained "conclusory statements." We disagree. "A conclusory statement is one that does not provide the underlying facts to support the conclusion." *Rizkallah v. Conner*, 952 S.W.2d 580, 587 (Tex. App.—Houston [1st Dist.] 1997, no writ); *Contractors Source, Inc. v. Amegy Bank Nat'l Ass'n*, No. 01-13-01000-CV, 2015 WL 505195, at *2 (Tex. App.—Houston [1st Dist.] Feb. 5, 2015, no pet.). Here, the objected-to statements summarize the business transactions plainly evidenced by business records. Therefore, the statements are not conclusory.

We overrule the guarantors' issue related to the affidavit.

## Conclusion

Having overruled all issues presented in the guarantors' briefs, we affirm the judgment of the trial court.

Harvey Brown
Justice

Panel consists of Justices Keyes, Higley, and Brown.

35



# CONSENT OF GUARANTORS

This Consent of Guarantors ("Consent") is made effective as of March 15, 2010, by the undersigned (the "Guarantors"), for the benefit of ENCORE BANK, NATIONAL ASSOCIATION (the "Lender").

## RECITALS:

A.  Guarantors have previously delivered to Lender the Guaranty Agreement (the "Guaranty Agreement") in connection with the obligations of BLYN II HOLDING, LLC, a Texas limited liability company (the "Borrower") to Lender evidenced by, among other instruments (collectively, the "Loan Documents"), a Promissory Note dated March 28, 2007, in the original principal amount of $6,000,000.00, executed by Borrower and payable to the order of Lender in accordance with the terms set forth therein, as modified.

B.  Borrower has requested Lender to modify certain provisions of the Loan Documents, as provided in the Note Modification Agreement (collectively, the "Agreement) of even date herewith, and as a condition thereof, Lender has required Guarantors to execute and deliver this Consent.

## AGREEMENT:

NOW, THEREFORE, for and in consideration of the premises contained herein and other good and valuable consideration, the receipt and legal sufficiency of which are hereby acknowledged, Guarantors, jointly and severally, hereby acknowledge, confirm, and agree with Lender as follows:

1.  Guarantors acknowledge and consent to each of the terms and provisions of the Agreement and the modification of the Loan Documents, as therein provided.

2.  Lender acknowledges and agrees that: (i) the Guarantors have not released, modified, or waived, any claim or cause of action that could possibly exist against Lender, and (ii) Guarantors have retained and reserve any claim that they may have had in the past, present, or future against Lender; and (iii) all statutes of limitations related to any cause of action which Guarantors may have with respect to the Note, Guaranty Agreement, or any agreements or liens related thereto, are hereby tolled. No applicable statute of limitation will commence to run until Guarantors have received written notice from Lender that the tolling agreement contained in item (iii) above is no longer in effect.

3.  Whenever the context so requires, references herein to the singular number shall include the plural, and likewise the plural shall include the singular; words denoting gender shall be construed to include the masculine, feminine, and neuter, where appropriate. If Guarantors consist of more than one party, the obligations of each party constituting Guarantors hereunder shall be joint and several.

4.  This Consent may be executed by facsimile and in multiple counterparts, each of which shall constitute an original instrument, all of which will constitute one and the same agreement.

5.  **THIS CONSENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES AND MAY NOT BE CONTRADICTED BY EVIDENCE OF PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OF THE PARTIES. THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES.**

3/30/10:8:30 am:H:\RSR\00206\25007\MOD 3.10\cg.wpd

EXECUTED effective for all purposes as of the date first above written.

GUARANTORS:

_____
ALLEN LAWRENCE BERRY

_____
ROBERT G. TAYLOR, II

_____
JOSEPH D. MCCORD

2

APPENDIX B

270